# Exhibit A

## TERMINALING AND THROUGHPUT AGREEMENT

THIS TERMINALING AND THROUGHPUT AGREEMENT (this "Agreement") made and effective as of the 27th of November  2023, between **Avanza Trading LLC,** a Delaware limited liability company (hereinafter "Product Owner"), and **Impala Terminals Burnside LLC,** a Delaware limited liability company (hereinafter "Impala") (Product Owner and Impala hereinafter sometimes referred to individually as a "Party" and collectively as "Parties").

### WITNESSETH:

**WHEREAS**, Impala operates a barge unloading and vessel loading ground storage terminal facility located in Darrow, Louisiana at mile marker LMR 169.5 (the "Terminal"); and

**WHEREAS**, Product Owner desires to arrange for the loading of 1,200,000/10% Metric Ton of coal; and

**WHEREAS**, Impala is willing to provide the Services (as defined below), consistent with the requirements of this Agreement; and

**NOW, THEREFORE**, in consideration of the promises and mutual covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound thereby, the Parties agree as follows:

1. **SCOPE OF AGREEMENT**.  During the Term, Impala shall provide Services and, if agreed upon, the Ancillary Services (as defined below) for Product Owner for which Product Owner agrees to pay Impala (as defined herein) and, if applicable, any Ancillary Service Fees (as defined herein), all on the terms and subject to the conditions set forth in this Agreement.

2. **DEFINITIONS**.

    (a)    Defined Terms.   The words and phrases listed in this Article shall have the following meaning whenever used in the Agreement, unless otherwise specified.

        Access Agreement means the agreement set forth in Exhibit B – Access Agreement.

        Affiliate means, when used with respect to any Person, any Person or entity that is Controlled by, Controls or is under common Control with such Person.

        Agreement has the meaning set forth in the preamble.

        Ancillary Services means any of the services provided by Impala pursuant to Article 10 (Ancillary Services).

        Ancillary Service Fees are those fees identified as "Ancillary Service Fees" on **Exhibit A – Services and Fees**.

Applicable Law means any applicable statute, law, regulation, ordinance, rule, determination, judgment, rule of law, order, decree, permit, approval, concession, grant, franchise, license, specification, requirement, or any similar form of decision of, or any provision or condition of any permit, license or other operating authorization issued by any Governmental Authority having or asserting jurisdiction over the matter or matters in question, whether now or hereafter in effect.

Business Day means a day, other than a Saturday or Sunday, on which banks in New York, New York are open for business.

Carrier means a third-party agent or contractor hired by Product Owner, who is in the business of transporting Product via Vessels.

Collateral has the meaning set forth in Section 14(a) (Lien and Security Interest).

Control means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

Day means, for the purposes of determining Free Period, a 24-hour period beginning at 7 a.m. local time the day after barges are constructively placed at the Terminal (as further set forth in Section 6(b)).

Force Majeure means circumstances not reasonably within the control of the Party claiming Force Majeure and which, by the exercise of due diligence, such Party is unable to prevent or overcome, and that prevents performance of such Party's obligations, including: acts of God, strikes, lockouts or other industrial disturbances, wars, riots, fires, floods, storms, orders of courts or Governmental Authorities, explosions, terrorist acts, breakage, accident to or breakdown of machinery, storage tanks or lines of pipe, inability to obtain or unavoidable delays in obtaining material or equipment, and similar events.

Force Majeure Notice has the meaning set forth in Section 18(a) (Force Majeure: Procedure).

Force Majeure Period has the meaning set forth in Section 18(a) (Force Majeure: Procedure).

Free Period has the meaning set forth in Section 6(b) (Discharge of Barges).

Governmental Authority means any federal, state, local or foreign government or any provincial, departmental or other political subdivision thereof, or any entity, body or authority exercising executive, legislative, judicial, regulatory, administrative or other governmental functions or any court, department, commission, board, bureau, agency, instrumentality or administrative body of any of the foregoing.

Impala has the meaning set forth in the Preamble.

Midstreaming Service means the loading of Product directly from Product Owner's river-barge Vessel into an ocean-going Vessel using a barge-mounted crane.

Month means a calendar month.

Party or Parties means each of Product Owner and Impala, who are referred to collectively as the "Parties."

Performance Assurance has the meaning set forth in Section 11(e) (Performance Assurance).

Person means any individual, partnership, limited partnership, joint venture, corporation, limited liability company, limited liability partnership, trust, unincorporated organization or Governmental Authority or any department or agency thereof.

Product means a commodity meeting the specifications set forth in Article 8 (Condition and Acceptance of Product) and any additional or modified specifications agreed to between the Parties, as outlined in Exhibit A, in writing and delivered under this Agreement.

Product Owner has the meaning set forth in the Preamble.

Services means the services identified as "Services" on **Exhibit A – Services and Fees.**

Tariff means, collectively, the "Burnside Terminal Rules and Regulations" and any other published tariff of Impala, including all other requirements, rules, regulations, and documents governing the operation of the Terminal that are posted on its website with the address The current Impala Terminals Burnside Rules and Regulations Rate Schedule, dated and effective February 1, 2021, shall remain valid and in force throughout the term of the Agreement, attached Exhibit C. https://www.impalaterminals.com/media/vrihbaii/2021_impala_burnside_terminal_rules.pdf

Term has the meaning set forth in Article 3 (Term).

Terminal has the meaning set forth in the Recitals.

Ton means a metric ton of 2,204.6 pounds *avoirdupois* weight.

Vessel means, as applicable, any river barge suitable for unloading Product at the Terminal or any ocean-going vessel suitable for loading Product at the Terminal, each of which is in the employ of or hired by Product Owner and capable of unloading and loading Product as required by the Tariff.

(b)    General Interpretations.

(i)    Unless the context otherwise requires, the capitalized terms used in this Agreement shall have the definitions set forth in this Article 2.

(ii)    The singular shall include the plural, and the masculine shall include the feminine and neuter, as the context requires.

(iii)    The terms "includes" or "including" mean "including, but not limited to."

(iv)    Any term not defined in this Article 2 or elsewhere in this Agreement (including an amendment or exhibit) that is used in this Agreement, shall have its plain meaning in common English usage provided that words and abbreviations having well-known meaning in the Maritime and Transportation industry shall have those meanings.

(v)    Reference to an agreement, contract or document shall include any subsequent amendments to such agreement, contract or document unless otherwise stated herein.  Reference to a Party includes that Party's successors and permitted assigns.

(vi)    Reference to a Governmental Authority shall include an entity succeeding to its functions.

(vii)    All documents required to be provided under this Agreement shall be in English.

(viii)    All monetary amounts contained in this Agreement refer to the currency of the United States.

(ix)    All references herein to time shall mean "Central  Prevailing  Time." Central Prevailing Time means either Central Standard Time or Central Daylight Savings Time, as in effect, from time to time, at the Terminal.

(x)    Reference to this Agreement shall be deemed to refer to this Agreement and all Exhibits and schedules attached hereto.

3.    **TERM**.

(a)    Term.    The term of this Agreement shall be for the period specified at Exhibit A, Fees, Part 1.

(b)    End of Term: Removal of Product.    Product Owner shall remove, or cause to be removed, its Product from the Terminal at Product Owner's sole cost and expense within thirty (30) days after the expiration of this Agreement, unless otherwise provided in this Agreement. No grace period or opportunity to cure shall apply to this covenant.

(i)    If Product Owner's Product is not removed within ninety (90) days after the expiration of this Agreement, then Impala shall, in addition to its right to collect a stockpile usage fee, have the right to sell the Product in any manner Impala chooses and Impala shall apply the proceeds from such sale, less Impala's costs and expenses (including the stockpile usage fee), to the amount outstanding due from Product Owner. Any net proceeds in excess of the amount due to Impala shall be paid to Product Owner.

(c)    Limits on Services at End of Term.    Should Impala be providing Services reasonably

calculated to end prior to the expiration of the term of this Agreement and such Services are not concluded on or prior to the expiration of the term of this Agreement, Customer shall be entitled to receive continued Services at the rates and on the conditions of this Agreement for such extended time as may be required for Impala to complete the Services.

4.    **THROUGHPUT CAPACITY AND STOCKPILE STORAGE**.

(a)    <u>Scope of Services</u>.  Impala shall provide the Services and, if directed by Product Owner or as otherwise provided herein, the Ancillary Services to Product Owner with respect to Product properly delivered to the fleeting services area across the Mississippi River from the Terminal as designated by Impala.  All Services and Ancillary Services shall be provided in a good and workmanlike manner.

(b)    <u>Storage Capacity</u>.  The specific location of Product Owner's stockpile storage shall be in Impala's sole discretion.  Impala shall have the right, in its sole discretion, to refuse to provide Services or Ancillary Services with respect to any Product in excess of the capacity in the stockyard to allow for reasonable working space for product handling, as determined by Impala in its sole discretion.

Impala shall provide, at the Terminal, and for Product Owner's cargo, ground storage on a base pad consisting of an adequate number of piles, with a maximum storage capacity as outlined in Exhibit A, Fees.  Any storage due Impala shall be calculated and invoiced monthly to Product Owner.  Time in storage shall commence on the date the first ton is unloaded on to the stockpile, unless otherwise agreed in writing.

(c)    <u>Not Leased Property</u>.  The allocation of the stockpile storage space to Product Owner is not and shall not be construed as a lease of real property.

(d)    <u>Storage Technique</u>.  Product shall be stored at the Terminal in a good and workmanlike manner.  Impala shall not be required by Product Owner to shape, recompact or periodically rearrange the Product stockpile and shall not be responsible for spontaneous combustion of any stockpiled Product.

(e)    <u>Product Segregation</u>.  Impala will reasonably attempt to segregate Product Owner's Product from the Product of any other Person, but Impala shall not have any liability to Product Owner as a result of any commingling unless caused by the gross negligence of Impala.

(f)    <u>Commingling Services</u>.  According to the specific instructions of Product Owner, Impala shall commingle Product of Product Owner such that the Product of Product Owner loaded onto ocean-going Vessels from either a river-barge Vessel or Product Owner's stockpiles at the Terminal meets the requested specifications from Product Owner.  Impala does not guaranty that any commingled Product will meet the requested specifications.

(g)    <u>Product Degradation and Liability</u>.

(i)    The Parties agree that normal variances in the measurement of quantity and weight of Product shipped in bulk exist and are recognized and quantity or weight of the Product furnished by Product Owner as being exact, and the utilization of same for invoice purposes shall not be considered as an admission of the exactness of the quantity and weight.

The Parties further agree that Impala does not have any obligation to employ any method of weighing or measuring Product Owner's cargo since the Parties recognize that there is no reasonable means to accurately check the quantity or weight without there being existing variances due to the diverse methods used in measuring bulk commodities. Notwithstanding the foregoing, nothing contained herein shall excuse Impala from liability for loss of Cargo if such loss (I) falls outside of the normal variances that are generally recognized and accepted by the Industry, and (II) is caused by the gross negligence or willful misconduct of Impala.

(ii)      Impala shall not have any liability as a result of Product degradation or weight loss.   Product Owner hereby acknowledges that water (and other suppressants) will be sprayed on the Product to control dust and this could result in degradation of the Product Owner's Product.   Additionally, from time to time, Impala may use products other than water to control dust if reasonably necessary in Impala's sole discretion, in which case Impala shall provide oral or written notice to and consult with Product Owner regarding the usage of such other dust suppressants.  In addition, Impala shall not be liable for (i) the quality of the Product if floods, hurricane surge, or other high water render the Product unusable for its intended purposes; or (ii) any change in the physical characteristics or quality of the Product, including the ash, calorific content, sulfur, and moisture content.

(iii)      If Product Owner delivers any material that does not meet the specifications for "Product" as defined in Article 2 (Definitions), then Product Owner, at its sole cost and expense, shall be responsible for promptly removing, or causing to be removed, such Product and any related cleanup of the Terminal in a manner acceptable to Impala in the exercise of its reasonable judgment.

(h)      Special Handling Charges.  Product Owner shall be responsible for any reasonable special handling charges associated with the monitoring, treatment or removal of Product that is determined by Impala to be a threat to the safety of the Terminal, individuals at the Terminal, other product owners stockpiling Product at the Terminal, or other Product stockpiled at the Terminal due to spontaneous combustion or any other unfavorable characteristic of the Product.

(i)      Inspection of Stockpile. Any representative of Product Owner may, at its own risk and cost, inspect any of its Product located at the Terminal at any time during daylight hours with prior reasonable notice to Impala and upon the execution of the Access Agreement and adherence to Impala's then-current safety standards for individuals accessing the Terminal. Upon arrival, such representative shall notify the Terminal supervisor on duty and adhere to any applicable provisions of the Tariff.  Such representatives shall not access the Terminal or inspect Product unless accompanied by Impala personnel.

5.      **SCHEDULES**.

(a)      Planning Schedules.  In addition to the reports and schedules required by the Tariff, no later than thirty (30) days prior to the anticipated date of Product Owner's first delivery of Product to the Terminal, Product Owner shall provide to Impala, for operational planning purposes, its anticipated deliveries of Product for the next six (6) Months.  At least seven (7) days prior to the end of each Month, Product Owner shall submit, in writing, any modifications to the previously delivered six (6) Month schedules.  All such schedules shall be subject to prior

written approval by Impala, which approval shall not be unreasonably withheld.

(b)    Contested Schedules.    If Impala withholds its approval of any of the proposed schedules, Product Owner and Impala shall use their reasonable efforts to determine a mutually agreeable schedule.

(c)    Laycan and Schdueling.    Product Owner shall abide by the Tariff for booking procedures and vessel dimensions.  Impala will accept "Notice of Readiness" when properly presented as defined in the Tariff.

Product Owner is to provide Impala, in writing, a ten (10) day laycan spread at least thirty (30) days prior to the date of the first day of the ten (10) day laycan spread.  No later than fourteen (14) days from the date of the first day of the original ten (10) day laycan spread, Product Owner is to identify in writing to Impala a four (4) day load window within such original ten (10) day laycan spread. In each case mentioned above, the written approval of Impala shall be required relative to the ten (10) day laycan and the four (4) day load window within the original ten (10) day laycan. Acceptance by Impala of a nomination of a Vessel shall be evidenced by Impala's confirmation by facsimile or e-mail transmittal to the Vessel Party (as such term is defined in the Tariff).

Product Owner may cancel a scheduled laycan spread without penalty by providing written notice of such cancellation to Impala at least twenty-one (21) days prior to the first day of the scheduled laycan spread. If Product Owner cancels a laycan spread less than twenty-one days prior to the first day of such laycan spread, Impala shall be entited to a "Cancellation Penalty" for Product Owner's account. The Cancellation Penalty is assessed per Vessel and is equal to one (1) days dockage per the tariff.

If Product Owner schedules a four (4) day loading window, it may cancel such scheduled loading window seven (7) days or more prior to the first day of the scheduled loading window and incur only the Cancellation Penalty.  If Product Owner fails to cancel a scheduled loading window at least seven (7) days prior to the first day of the scheduled loading window, and Product Owner does not execute load out to Vessel during that loading window, Impala shall be entitled to a "Window Cancellation Penalty" equal to two (2) days dockage per the tariff for Product Owner's account in place of the Cancellation Penalty.

6.    **VESSEL UNLOADING AND LOADING**.  Product Owner shall comply with the Tariff for all Vessel operations. In addition, the following provisions apply:

(a)    Fleeting Services.  Impala reserves the right to require barge carriers to use its or its contractor's fleet and harbor towboat services in order to ensure an orderly and safe operation of the Terminal.

(b)    Discharge of Barges.

(i)    Impala shall be entitled to three (3) free Days to discharge Product from the Product Owner's barges that have been designated for storage (the "Free Period").  The parties agree that the terminal shall not be obligated to unload more than 8 barges per calendar day when accounting for the total free days of any barges placed for discharge to ground storage.

(ii)    The Parties agree that if Impala fails to discharge any barges destined for ground storage within the Free Period, other than for Force Majeure, Product

Owner will bill any demurrage charges to Impala. Impala shall directly pay the demurrage costs, if any, per barge for those barges held beyond the "Free Period" until such time as those barges have been blade/deck cleaned and made available to Product Owner's third-party barge carrier. Notwithstanding the foregoing, Impala has no demurrage liability with respect to barges that Product Owner identifies as barges that will be transloaded directly from such river barge to an ocean-going vessel.

(iii)   The above loading rates assume that Product Owner delivers Product in open-hopper river barges. To the extent unloading is slowed because Product Owner has delivered stack-top or roll-top barges, the Free Period will be adjusted accordingly. All cover removal and replacement expense incurred shall be directly billed to the Product Owner, unless the Parties agree that the barge owner shall be directly billed.

(c)   <u>Timing of Demurrage Claims</u>.   Notwithstanding anything in this Section or the Tariff, Product Owner waives any demurrage claim to which it may be entitled if Product Owner does not provide notice to Impala on or before sixty (60) calendar days after the date on which the applicable Vessel completes loading.

(d)   <u>Vessel Loading Guarantee.</u>   The load guarantee, as indicated in Attachment A, is subject to the following:

(i)   Time lost due to hold compaction excluded.
(ii)   Time lost due to draft survey excluded.
(iii)   If product is not available for loading through no fault of Impala, time waiting excluded.
(iv)   Delays caused by the Vessel excluded.
(v)   All products must be acceptable to load with P&I Club and ship master approval if applicable.
(vi)   Weather delays excluded.

(e)   <u>Demurrage/Despatch.</u>   In the event Impala loads less than the minimum tons per the daily guarantee outlined in Attachment A (the "Minimum Daily Guaranteed Tons"), Impala shall reimburse Vessel Demurrage as outlined in the Tariff.   In the event Impala loads more than the Minimum Daily Guaranteed Tons, Product Owner shall pay Impala despatch at one half the demurrage rate per day as outlined in the Tariff.   Demurrage rates are per the Charter Party and must be declared prior to Vessel arrival.

7.   **WEIGHING AND SAMPLING**.   All weights will be settled using Vessel Draft Survey weights, provided to Impala by Product Owner at Product Owners expense.   Automatic mechanical sampling services are provided by an independent third party contractor and are available to the Product Owner at the Terminal at the sole cost and expense of the Product Owner. It is understood and agreed that Impala shall not, under any circumstances, be responsible or liable for the sampling services or any lack thereof.

8.    **CONDITION AND ACCEPTANCE OF PRODUCT**.

(a)    <u>Product Characteristics</u>.  Product Owner represents, warrants, and covenants that all Product delivered to the Terminal shall meet the following specifications:

(i)    Delivered Product shall be substantially free of foreign objects, steel, lumber and other extraneous material and otherwise "free flowing;"

(ii)    Without the prior written consent of Impala, which may be withheld in its sole discretion, delivered Product shall not exceed four (4) inches in any dimension;

(iii)    No Product shall be delivered that cannot be bulldozed;

(iv)    All Product delivered must reasonably flow through gates, feeders, chutes and transfer points at the Terminal;

(v)    Delivered Product shall not contain excessive moisture or fines that will impede handling;

(vi)    Delivered Product shall not be treated with a petroleum based product;

(vi)    Delivered Product shall not have a temperature exceeding the maximum as described in the applicable guidelines as supplied by the International Maritime Organization, and/or what is deemed acceptable by the master of the Vessel; and

(vii)    Delivered Product shall also meet all other specifications agreed to in writing by the Parties.

(b)    <u>Rejection of Product</u>.  Impala reserves the right to reject any Product delivered to the Terminal that does not comply with Section 8(a) (Product Characteristics).  Product Owner shall reimburse Impala for any additional costs that Impala reasonably incurs in handling any such non-compliant Product.    Impala will not provide Services to Product Owner with respect  to materials other than that product designated herein without prior approval of Impala.

9.    **OWNERSHIP OF PRODUCT**.    Any Product that Product Owner delivers to the Terminal is and shall remain the property or must be under legal possession of Product Owner and Impala will have no responsibility whatsoever for any Product prior to unloading of such Product at the Terminal.  Impala has no actual or beneficial title to any Product en route to or from, or located within, the Terminal.  The foregoing shall not, however, interfere with or preclude the exercise by Impala of lien or other rights it may have by virtue of this Agreement, at law or in equity with respect thereto.

10.    **ANCILLARY SERVICES**.  Impala may provide some or all of the following Ancillary Services to Product Owner after receipt of written notice from Product Owner requesting the particular Ancillary Service that Product Owner desires.  Upon acceptance of such request by Impala, Impala will provide the Product Owner with the applicable item of service in exchange for the corresponding fee(s) as set forth in **Exhibit A – Services and Fees**. For any items of work or services not specifically listed in this Agreement (such as sampling or stockpile maintenance),

Product Owner may request, and Impala may decide, in its sole discretion, whether to provide the additional requested service. Such additional service shall be invoiced as an Ancillary Service in an amount equal to the greater of (i) the amount agreed to in writing by the Parties or (ii) the fees set forth in **Exhibit A– Services and Fees**.

11.    <u>**RATES AND PAYMENTS**</u>

(a)    <u>Rates</u>.  Subject to the terms and conditions of this Agreement, Product Owner shall pay Impala for the Services at the rates set forth at Exhibit A, Fees, and the Burnside Tariff, as applicable.  The Parties hereby agree that the rates to be paid to Impala by Product Owner pursuant to this Agreement shall be inclusive of all stevedoring charges, wharfage, dockage, equipment use or rental fees, tolls, taxes, tariffs, and any other fees or costs levied against Impala in the performance of Services hereunder.  All other fees and costs, including but not limited to, shifting and fleeting fees, wharfage and dockage fees, mooring fees, port charges, tolls, harbor fees, taxes, tariffs, survey fees, security fees, and any other fees or costs levied against the Ocean Vessel, River Barges or the Cargo, shall be for account of Product Owner, the Ocean Vessel, charterers or agents as customary.  Any extra services requested by Product Owner that are not considered to be a normal and regular function of a standard stevedoring transfer service or are outside the scope of the Services to be performed under this Agreement shall be priced by Impala on a case-by-case basis.

(b)    <u>Invoicing</u>.  Impala shall submit to Product Owner a written invoice for Services, together with supporting documentation as may be reasonably requested by Product Owner, to the address listed for Product Owner in Section 21, at Impala's sole discretion but in any event, no later than five (5) workings days following the end of the month in which such Services were provided. Any invoiced amount based upon a Cargo unit of weight shall be calculated in accordance with Exhibit A, Fees.  Payment of all undisputed, invoiced amounts shall be made by Product Owner to Impala, to the address listed for Impala in Section 21, with attention to Accounts Payable, within thirty (30) days of Product Owner's receipt of Impala's written invoice and supporting documentation, in United States dollars, without any discount, adjustment, or deduction, except as permitted under this Agreement.

(c)    <u>Interest on Late Payments</u>.  Any invoice that remains unpaid fifteen (15) days from the date of such invoice shall earn interest, compounded at the rate of one and one-half percent (1.5%) per Month or portion thereof or the maximum legal interest rate allowed under Applicable Law to the extent that one and one-half percent (1.5%) violates Applicable Law from the due date of such payment through Impala's actual receipt of the delayed amounts.

(d)    <u>Tariff Invoicing</u>.  The Parties will invoice and pay all amounts due under the Tariff pursuant thereto.

(e)    Performance Assurance.  Should Impala have reasonable grounds to believe that the creditworthiness of the Product Owner has become unsatisfactory, then Impala may require adequate assurance of the Product Owner's ability to perform any obligation hereunder including, but not limited to, its ability to make payment. Such assurance ("Performance Assurance") may include (i) posting of a letter of credit in favor of Impala by an issuing bank reasonably acceptable to Impala,

(ii) posting of cash collateral with Impala, or (iii) other security reasonably acceptable to Impala. If Product Owner fails to provide such Performance Assurance within two (2) Business Days from the date of Product Owner's receipt of Impala's request, then such failure to provide Performance Assurance shall be deemed a breach of this Agreement.

(f) Additional Storage Charges. In addition to the Rates provided herein, Product Owner shall pay the following storage fees if required:

(i)    Late Charge. Should any of Product Owner's Product remain at the Terminal beyond the termination or expiration of this Agreement, Product Owner shall remain obligated to all of the terms and conditions set forth in this Agreement through the date of such termination or expiration and, in addition, shall be obligated to pay an additional chart until all of Product Owner's Product (excluding any unrecoverable Product) is removed from the Terminal. The additional charge shall be equal to five thousand dollars ($5,000) per day, provided that Customer shall remain obligated for any Excess Storage Charge (as this term is defined below). Product Owner shall pay for any charge or liability claims or asserted against Impala due to Product Owner's Product remaining at the terminal beyond the termination or expiration date of this agreement unless the delay in removal of such Product results from breach of this agreement by Impala. If Impala determines that Product must be removed from the terminal after the termination or expiration of this Agreement, Product Owner must remove the Product immediately or such remaining Product may be subject to removal by the Terminal and the charges for the same shall be met solely by Product Owner;

(ii) Excess Storage Charge. Product Owner may request additional space from Terminal, which Terminal may accept or deny at Impala's sole discretion, and rate for such additional space shall be on a case by case basis;

(iii) Removal of Fines. Product Owner shall pay Impala for removal and disposal of any Product fines remaining at the terminal location after removal of Product Owner's Product at the applicable rates.

12.    **PRODUCT OWNER'S REPRESENTATIONS, WARRANTIES, AND COVENANTS**.

(a)    <u>Prevention of Spontaneous Combustion</u>.  Product Owner covenants that it will ship and load Product stored at the Terminal with sufficient frequency to prevent spontaneous combustion from occurring in Product Owner's Product.

(b)    <u>Insurance Responsibility</u>.  Product Owner acknowledges that Impala does not insure Product Owner's Product, and any insurance on the Product must be obtained by the Product Owner.  If Product Owner carries insurance on the Product, such insurance shall be endorsed to include a waiver of subrogation rights against Impala and copies of such insurance and endorsements shall be furnished to Impala promptly upon its request.

(c)    <u>Tariff Review</u>.  Product Owner represents that it has reviewed and understands the Tariff, and covenants that Product Owner will review the Tariff periodically for changes and

updates.  This Agreement shall be subject to and governed by the Tariff as in effect on the date the Services are provided.  Product Owner shall, and shall cause its Carriers to, comply with all applicable provisions of the Tariff.  If there is a conflict between this Agreement and the Tariff, the terms of this Agreement shall control.

(d)    Common Carrier.  Product Owner acknowledges that Impala is not a "common carrier" and that Impala does not hold itself out to Product Owner or any other customer of the Terminal to provide common carrier services or any other common carrier services of any type. Product Owner represents, warrants, and covenants that any Vessels presented for unloading and loading hereunder are and shall not be common carriers by water, and neither Product Owner nor its Vessels provide or shall provide common carrier by water services of any type.

(e)    Maritime Jurisdiction.  Product Owner covenants that it shall not carry on the business of forwarding or provide any other services in such a manner as would subject Impala to the jurisdiction of the Federal Maritime Commission.

(f)    Safety.  Product Owner covenants that its personnel at the Terminal will comply with Impala's current safety standards.

(f)    Acknowledgement.    OTHER THAN AS MAY BE SET FORTH HEREIN EXPRESSLY, IMPALA MAKES NO WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS, IMPLIED, ORAL, WRITTEN OR OTHERWISE, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR PURPOSE OR FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF ANY PARTY'S RIGHT, OR WARRANTIES ARISING BY CUSTOM, TRADE USAGE, PROMISE, EXAMPLE OR DESCRIPTION, ALL OF WHICH PRODUCT OWNER EXPRESSLY DISCLAIMS AND WAIVES.

13.    **TAXES**.  Product Owner shall pay or cause to be paid all taxes (including sales, use capital, and ad valorem taxes), levies, royalties, assessments, licenses, fees, charges, surcharges and sums due of any nature whatsoever (other than income taxes, gross receipt taxes and similar taxes) assessed by any Governmental Authority on the Services, the Ancillary Services, or the Product (including the transfer, use, or sale of the Product).  Product Owner shall be responsible for the filing of all tax returns related to the Product and Product Owner's receipt of the Services and Ancillary Services.  Product Owner agrees to indemnify and hold Impala harmless with respect to all such taxes.  Nothing in this Article shall be construed to make Product Owner responsible for income, gross receipt taxes, or similar taxes incurred by Impala in connection with the provision of the Services and Ancillary Services or the operation of the Terminal.

14.    **LIENS**.

(a)    Lien and Security Interest.  To secure the payment of all fees and other sums due from Product Owner under this Agreement and the performance of Product Owner's other obligations under this Agreement, Product Owner hereby assigns, conveys, transfers, and grants to Impala an irrevocable and continuing lien and security interest in and on all of its Product from time to time located at the Terminal or otherwise in the care and custody of Impala (collectively, the "Collateral").  Product Owner hereby irrevocably authorizes Impala to file at any time and from time to time any and all financing statements and amendments thereto as Impala shall determine to be necessary or desirable to perfect or maintain the perfection of the foregoing security

interest in the Collateral, and Product Owner shall furnish such information and additional documents as Impala shall request with regard to such financing statements and perfection of this security interest.

(b)    <u>Secured Party Rights Upon Termination</u>.    Upon the occurrence of an event of default under Article 19 (Default and Termination), Impala shall have all of the rights and remedies of a secured party under the Uniform Commercial Code as in effect in the State of New York with respect to the Collateral, including (without limitation) the right to take possession of the Collateral, in addition to all of the other rights and remedies provided herein or under Applicable Law on account of such event of default.  Product Owner acknowledges that five (5) Business Days prior written notice of any sale or other disposition of the Collateral shall be reasonable notice thereof. Product Owner waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of Impala's rights and remedies pursuant to this Article, including Impala's right following an event of default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

(c)    <u>Power of Attorney</u>.  Product Owner hereby irrevocably appoints Impala as its true and lawful attorney-in-fact with full power and authority in the place and stead of Product Owner or in Impala's name, for the purposes of carrying out the terms of this Article, to take any and all appropriate action and to execute any and all documents and instruments as may be necessary or useful to accomplish such purposes.

15.    **SURCHARGES**.

(a)    <u>Surcharge for Changes</u>.    If, during the Term, Applicable Laws are enacted or amended that require Impala to make substantial and unanticipated capital expenditures with respect to the Terminal or require changes to the operation of the Terminal that cause Impala to incur material additional operating costs, Impala may impose a monthly surcharge to cover Product Owner's pro rata share of the cost of complying with these Applicable Laws, based upon the percentage of Product Owner's use of the services or facilities impacted by such new Applicable Laws relative to the overall capacity of the Terminal.

(b)    <u>Cost Sharing</u>.  Impala and Product Owner shall negotiate in good faith to mitigate the impact of any such new or amended Applicable Laws and to determine the level of the monthly surcharge referenced in Section 15(a) (Surcharge for Changes).

16.    **INSURANCE**.  Product Owner shall maintain all insurance coverage required by the Tariff and the Access Agreement.

17.    **GOVERNMENT REGULATIONS**.

(a)    <u>Product Owner Certification</u>.    The Product Owner represents, warrants, and covenants, that in its performance hereunder, none of the Product covered by this Agreement was or will be produced or withdrawn from storage or imported in violation of any Governmental Authority, nor in violation of any Applicable Law.

(b)    <u>Applicable Law</u>.    The Parties shall comply with all Applicable Law which directly or indirectly affects the Product throughput hereunder, or any receipt, throughput delivery, transportation, handling or storage of Product hereunder or the ownership, operation or condition

of the Terminal. Each Party shall be responsible for compliance with all Applicable Laws associated with such Party's respective performance hereunder. If any obligation imposed upon a Party under this Agreement shall at any time be in conflict with any requirement of Applicable Law, then this Agreement shall immediately be modified to conform the obligation so affected to the requirements of the Applicable Law, and all other provisions of this Agreement shall remain effective.

18.    **FORCE MAJEURE**.

(a)    <u>Force Majeure: Procedure</u>. As soon as possible upon the occurrence of a Force Majeure, but in any event no later than two (2) Business Days after the occurrence of a Force Majeure, the Party claiming a Force Majeure event (the "Claiming Party") shall inform the other Party with written notice of the occurrence of such Force Majeure (a "<u>Force Majeure Notice</u>"). The Claiming Party shall identify in such Force Majeure Notice the approximate length of time that the Claiming Party believes in good faith such Force Majeure shall continue (the "<u>Force Majeure Period</u>"), what impact the Force Majeure will have on the Claiming Party's performance of its obligations under this Agreement, and the steps the Claiming Party will take to mitigate the impact of such Force Majeure. The Claiming Party will be excused from performance of its obligations under this Agreement to the extent necessary to overcome the impact of such Force Majeure. Upon the cessation of the Force Majeure, the Claiming Party will promptly resume its performance of its obligations under this Agreement. The other Party shall not have any right to terminate this Agreement due to a Force Majeure or any other reason.

19.    **DEFAULT**.

(a)    <u>Events of Default</u>. The following shall be deemed events of default under this Agreement:

(i)    Failure of Product Owner to make any payments when due and such failure is not cured within five (5) days after notice from Impala;

(ii)    Failure of Product Owner to provide Performance Assurance as provided under this Agreement;

(iii)    Failure of either Party to perform or comply with any other material obligation (including the breach of any representation, warranty, or covenant) under this Agreement and such failure is not cured within thirty (30) days after notice from the non-defaulting Party; or

(iv)    The Party (A) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy, insolvency, reorganization or similar Applicable Law, or has any such petition filed or commenced against it and such petition filed or commenced against it is not dismissed or stayed within sixty (60) days of its filing, (B) makes an assignment or any general arrangement for the benefit of creditors, (C) otherwise becomes bankrupt or insolvent (however evidenced) or (D) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets.

(b)    <u>No Right to Terminate</u>. Upon the occurrence of an event of default under this

Agreement, the non-defaulting Party shall not have the right to terminate this Agreement but shall have the right of all other remedies available under Applicable Law.

20.    **NOTICES**.  All notices, requests, demands, and other communications hereunder will be in writing addressed as set forth below, and will be deemed to have been duly given: (i) if by transmission by facsimile or hand delivery, when delivered; (ii) if mailed via the official governmental mail system, five (5) Business Days after mailing, provided said notice is sent first class, postage pre-paid, via certified or registered mail, with a return receipt requested; (iii) if mailed by an internationally recognized overnight express mail service such as Federal Express, UPS, or DHL Worldwide, one (1) Business Day after deposit therewith prepaid; (iv) if by e-mail, one Business Day after delivery with receipt confirmed; or (v) if a Party refuses to take delivery of such notice, on the day of such refusal.  All notices will be addressed to the Parties at the respective addresses as follows:

| If to Impala: | If to Product Owner: |
|---|---|
| Impala Terminals Burnside LLC<br>4258 Highway 44<br>Darrow, LA 70725<br>Attn: Terminal Manager<br><br>Email:<br>Allen.Walker@impalaterminals.com<br><br>Cc Email: houstonlawyers@trafigura.com | Avanza Trading LLC<br>9040 Kimberly Blvd<br>Boca Raton, FL 33424<br>Attn:  Andy Smolenack<br><br>Email:<br>Andy.smolenack@avanzatrading.com |

or to such other address or to such other person as either Party will have last designated by notice to the other Party given in accordance with this Article.

21.    **INDEMNITY**.

(a)    Impala Indemnity Obligations.  Except in case of gross negligence or willful misconduct, or breach of a contract Impala shall defend, protect, indemnify, and hold harmless Product Owner from and against any and all demands, claims (including third-party claims), losses, costs, suits, or causes of action (including, but not limited to, any judgments, losses, liabilities, fines, penalties, expenses, interest, reasonable legal fees, costs of suit, and damages, whether in law or equity and whether in contract, tort, or otherwise) for or relating to (i) personal or bodily injury to, or death of the employees of Impala and, as applicable, its Carriers, customers,

representatives, and agents, (ii) loss of or damage to any property, products, material, and/or equipment belonging to Impala and, as applicable, its Carriers, customers, representatives, and agents, and each of their respective affiliates, contractors, and subcontractors, . Impala's indemnity obligations under this Section 21(a) are in all respects subject to Article 23 (Limitation of Liability) below.

(b)    Product Owner Indemnity Obligations.    Except in case of gross negligence willful misconduct, or breach of contract Product Owner shall release, defend, protect, indemnify, and hold harmless Impala and, and each of its respective Affiliates, officers, directors, shareholders, agents, employees, successors-in-interest, and assignees from and against any and all demands, claims (including third-party claims), losses, costs, suits, or causes of action (including, but not limited to, any judgments, losses, liabilities, fines, penalties, expenses, interest, reasonable legal fees, costs of suit, and damages, whether in law or equity and whether in contract, tort, or otherwise) for or relating to (i) personal or bodily injury to, or death of the employees of Product Owner and, as applicable, its carriers, customers, representatives, and agents; (ii) loss of or damage to any property, products, material, and/or equipment belonging to Product Owner and, as applicable, its carriers, customers, representatives, and agents, and each of their respective affiliates, contractors, and subcontractors;. Product Owner's indemnity obligations under this Section 21(b) are in all respects subject to Article 22 (Limitation of Liability) below.

22.    **LIMITATION OF LIABILITY**. UNLESS EXPRESSLY PROVIDED FOR HEREIN, NO PARTY SHALL BE LIABLE TO THE OTHER PARTY EXCEPT FOR DIRECT ACTUAL DAMAGES. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR EQUITY ARE WAIVED. NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS, OR OTHER BUSINESS INTERRUPTION DAMAGES, WHETHER BY STATUTE, IN TORT OR IN CONTRACT, UNDER THIS AGREEMENT, ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE.

23.    **CONFIDENTIALITY**. With respect to its performance pursuant to this Agreement, Product Owner will abide by the terms of the confidentiality agreement in place with Impala or its Affiliates.

24.    **MISCELLANEOUS**

(a)    Entire Agreement.  This Agreement, together with all Exhibits, the Tariff, and any applicable confidentiality agreement, represents the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior writings, communications, discussions, representations or understandings, whether written or oral.  This Agreement may only be altered, amended or modified by a written instrument duly executed by both Parties.

(b)    Governing Law: Jurisdiction.  This Agreement and all matters arising from or relating to this Agreement shall be governed by and construed in accordance with the laws of the

State of New York, without giving effect to its conflict of laws principles. Each Party hereby irrevocably submits to the exclusive jurisdiction of any federal court of competent jurisdiction situated in the United States District Court for the Southern District of New York, or if such federal court declines to exercise or does not have jurisdiction, in the appropriate court of the State of New York with jurisdiction over the borough of Manhattan. The Parties expressly and irrevocably submit to the jurisdiction of said courts and irrevocably waive any objection which they may now or hereafter have to the laying of venue of any action, suit or proceeding arising out of or relating to this Agreement brought in such courts, irrevocably waive any claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum and further irrevocably waive the right to object, with respect to such claim, action, suit or proceeding brought in any such court, that such court does not have jurisdiction over such Party. The Parties hereby irrevocably consent to the service of process by registered mail, postage prepaid, or by personal service to the addresses set forth in Article 21 (Notices). Nothing contained herein shall affect the right to serve process in any manner permitted by Applicable Law.

(c)    <u>WAIVER OF JURY TRIAL</u>.    EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS RELATING TO THIS AGREEMENT OR ANY PERFORMANCE OR FAILURE TO PERFORM OF ANY OBLIGATION HEREUNDER.

(d)    <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts (including by facsimile or portable document format (pdf)) for the convenience of the Parties hereto, each of which counterparts will be deemed an original, but all of which counterparts together will constitute one and the same agreement.

(e)    <u>Headings and Severability</u>.    Headings are for reference purposes only and do not form a part of this Agreement. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be valid and effective under applicable law, but if any provision of this Agreement or the application of any such provision to any person or circumstance will be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision hereof, and the Parties will negotiate in good faith with a view to substitute for such provision a suitable and equitable solution in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, illegal or unenforceable provision.

(f)    <u>Time is of the Essence</u>.    Time is material and of the essence with respect to payments due under this Agreement.

(g)    <u>No Third Party Beneficiaries</u>.    It is expressly understood that the provisions of this Agreement do not impart enforceable rights in anyone who is not a Party or successor or permitted assignee of a Party.

(h)    <u>Material Safety Data Sheets</u>.    Product Owner shall provide to Impala any "Material Safety Data Sheets" as required under Applicable Law.

(i)    <u>Assignment</u>.    No party may assign this Agreement, in whole or in part, to any person or entity, without the prior written consent of the other party, which consent shall not be unreasonably withheld, delayed or conditioned. Any such assignment notwithstanding, each party shall remain

liable for the performance of its respective obligations under this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the date first above written.

**IMPALA TERMINALS BURNSIDE LLC**       **AVANZA TRADING  LLC**

By:_____       By:_*Andrew Smolenack*_____

Name: _____       Name:___Andrew Smolenack_____

Title:_____       Title:___Trader_____


By:_____

Name: _____

Title:_____

## Exhibit A

## Services and Fees

| Services | |
|---|---|
| The following items shall compromise the Services: | |
| **List of Items included in Services** | **Notes** |
| 1. Stockpiling | Segregated stockpiling and normal, routine maintenance thereof |
| 2. Storage | Storage of the Product. |
| 3. Unloading | From a river-barge Vessel to the stockpile |
| 4. Loading | From a river-barge Vessel or the stockpile to an ocean-going Vessel |
| 5. Commingling | Per Product Owner's reasonable written instructions. |
| 6. Product | Coal |

| Fees | |
|---|---|
| 1. Rate and Unit of Measure<br>   a. Vessel Unloading and Loading fee<br>   b. Cargo Unit Basis for Invoicing<br>   c. Volume<br>   d. Term | Rate $3.50 stockpile to vessel per Metric Ton<br>Two zones up to 30,000 metric tons of storage per each zone.<br>From 01 January 2024 – 31 December 2026<br><br>If, at the end of the Term, Product Owner has failed to move through the Terminal the metric Ton Minimum, then within ten (10) days as from receiving an invoice therefore from Impala, Customer shall pay Impala an amount equal to: (i) the Metric Ton Minimum minus the actual volume of Product and unloaded from Product Owner during the term, multiplied by (ii) the Rate ($3.50) (the "Shortfall Payment"). The Shortfall Payment shall be paid within thirty (30) days of the end of the Term. |

Classified as: PRIVATE AND CONFIDENTIAL

| | |
|---|---|
| 2.  Vessel Guaranteed Loading Rate | SHINC<br>40,000 for material loading from ground storage to vessel<br>15,000 for material loading barge direct to vessel<br><br>These guaranteed loading rates based on normal terminal operations, open hopper barges. Any special requests, ie, soft loading, slow loading, etc, can negate the above guarantees. |
| 3.  Piles, Capacity, Storage Freetime and Fees, if applicable | Number of piles and stockpile configuration will be at Impala's discretion depending on the tonnage that Product Owner conveys to Impala for handling<br><br>Should Impala have adjacent storage space available and designated for Product Owner to use for its 2 stockpiles, then Impala and Product Owner shall cooperate to maximize the potential storage and blending plan such that the Product Owner may exceed its ground storage maximums, as applicable and agreed between the parties. |
| **Ancillary Service Fees:** | |
| 4.  Section 11(f) (i) | $5,000/day flat rate for any left over tonnage after 05 January 2027 |

Classified as: PRIVATE AND CONFIDENTIAL

| | |
|---|---|
| 5. Minimum Throughput | 400,000 metric ton minimum throughput per calendar year for three (3) years

There will be an annual volume requirement (outlined above).  Any shortfall of this tonnage annually will be charged the full rate at the end of each calendar year, with credit given for tons to ship prior to the following year's annual volume requirement, at Product Owner's discretion. |
| 6. 2023 Shortfall: | Product Owner to pay 30% of 2023 shortfall payments when due, with credit for tons to ship under the volume commitment (first tons shipped in 2024 to meet the 2023 annual minimum at applicable 2023 rate). |

Exhibit B

Access Agreement

# TERMINAL ACCESS AGREEMENT ___ ___

This Terminal Access Agreement (this "**Access Agreement**") is entered into on,_____(the "**Effective Date**") by and between Impala Terminals Burnside LLC ("**Impala**"), and _____ ("**Invitee**").  Impala and Invitee are sometimes hereinafter referred to individually as "**Party**" and/or collectively as "**Parties**."

## RECITALS

**WHEREAS**, Invitee desires the right to access the Terminal (defined below); and

**WHEREAS**, Impala agrees to provide access to Invitee to the Terminal subject to the terms and conditions of this Access Agreement.

**NOW THEREFORE**, in consideration of the mutual premises and covenants set forth herein, Impala and Invitee hereby agree as follows:

## AGREEMENT

1.0     <u>**Term.**</u>   The term of this Access Agreement shall commence on the Effective Date and conclude immediately upon written notice of termination provided by Impala to Invitee.  All obligations accrued by both Parties prior to such termination date shall survive termination.

2.0     <u>**Access.**</u>   Impala hereby grants Invitee and such of its agents, representatives and invitees (collectively, "**Agents**") and each of its and their employees, all as designated in writing to Impala from time to time the right and privilege to access its bulk terminal facility in Darrow, Louisiana (the "**Terminal**").   Invitee, its Agents and each of its and their respective employees shall access the Terminal in a manner as to cause minimum interference with Impala's operations.

Invitee shall be absolutely responsible and liable for its Agents and their actions, and for their compliance and/or non-compliance with the terms and conditions of this Access Agreement.

3.0     <u>**Terminal Rules.**</u>  Invitee agrees to comply with and to cause its Agents to comply with all rules posted by Impala at the Terminal, as in effect from time to time.

4.0     <u>**Compliance with Laws and Regulations.**</u>  Invitee agrees to comply and to cause its Agents to comply with all federal, state and local laws, statutes, ordinances, rules, and regulations that may be applicable to Invitee's and its Agents activities at the Terminal.  Invitee shall obtain and cause its Agents to obtain all permits and licenses required by law.

5.0     <u>**Controlled Substance Abuse.**</u>  Invitee shall have adopted policies and procedures to ensure a drug and alcohol free work place.  Invitee will enforce its policy with appropriate drug and alcohol testing programs.  Invitee's testing policy will specify substances, testing frequency and threshold levels which, at a minimum, comply with the Department of Transportation drug testing regulations.

6.0     <u>**Safety of Invitee's Vehicles and Equipment.**</u>  Invitee agrees that all vehicles and equipment owned, leased or otherwise under the control of the Invitee and its Agents will be properly maintained, and in a safe condition.  Invitee shall remove any equipment that in Impala's discretion poses a safety hazard at the Terminal.  In the event Invitee fails to remove such unsafe equipment, Impala has the right to remove the unsafe equipment with Invitee paying or reimbursing Impala for the cost of such removal.

7.0     <u>**Incident Reporting.**</u>  Invitee must report all incidents (including accidents and near misses) that occur at the Terminal in writing to Impala within twenty-four (24) hours following such incident.  The report should describe the incident and include any investigative materials or documents that Invitee completes, and any related documentations and reports submitted to any entity, including but not limited to, any governmental agency, Invitee's insurance, or others.

**8.0**    **No Agency Relationship.**  Neither Invitee nor its Agents act under the direction, control, or supervision of Impala and none of the foregoing is an agent of Impala.

**9.0**    **Insurance.**  Invitee shall maintain at all times those minimum insurance requirements set forth in Schedule I attached hereto and supply Impala with evidence thereof before accessing the Terminal.

**10.0**    **Indemnification**

**10.1**    Duty to Indemnify Impala Group.  Except as expressly provided otherwise in this Access Agreement, **INVITEE SHALL RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS** Impala, Impala's general partner, subsidiaries, affiliates, and members and each of its and their respective officers, directors, employees, agents, contractors, successors, and assigns (excluding any member of Invitee Group) (collectively the "**Impala Group**") from and against all claims, suits, causes of action, demands, losses, liabilities, damages, costs, expenses, fees (including, but not limited to, reasonable attorney's fees), and court costs (collectively "**Claims**"), inclusive of Claims made by third parties, arising from or relating to any injury to or death of persons and/or damage, loss, or injury to any property, **EXCEPT TO THE EXTENT OF THE NEGLIGENCE OR WILLFUL MISCONDUCT OF IMPALA OR ANY MEMBER OF IMPALA GROUP.**

**10.2**    Duty to Indemnify for Pollution Events.  Notwithstanding anything to the contrary in this Access Agreement, in the event of any escape, release, discharge, threat of discharge, or disposal of any pollutants or hazardous materials from any member of Invitee Group's vehicles or equipment or otherwise caused by any member of the Invitee Group while in, on, or adjacent to the Terminal (each such event a "**Pollution Event**"), Impala shall have the right to commence emergency response and containment or clean-up activities, as deemed appropriate or necessary by Impala or required by any governmental authorities, and shall notify Invitee, as soon as reasonably possible, of such activities.  **INVITEE SHALL ASSUME ALL RESPONSIBILITY FOR, AND SHALL RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS IMPALA GROUP FROM AND AGAINST, ANY AND ALL CLAIMS ARISING FROM OR RELATING TO A POLLUTION EVENT EXCEPT TO THE EXTENT THAT INVITEE SHALL SHOW ANY SUCH POLLUTION EVENT IS CAUSED BY THE SOLE NEGLIGENCE OF IMPALA.**

**10.3**    No Limitation.  The scope of these indemnity provisions may not be altered, restricted, limited, or changed by any other provision of this Access Agreement.  The indemnity obligations of the Parties as set out in this Section 10 are independent of any insurance requirements as set out in Section 9, and such indemnity obligations shall not be lessened or extinguished by reason of a Party's failure to obtain the required insurance coverages or by any defenses asserted by a Party's insurers.

**10.4**    Waiver of Consequential and Other Damages.    EXCEPT WITH RESPECT TO A PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER, IN NO EVENT SHALL A PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, NO MATTER HOW CHARACTERIZED, RELATING TO THIS ACCESS AGREEMENT AND ARISING FROM ANY CAUSE WHATSOEVER.

**10.5**    Survival.  The indemnity and other such obligations contained herein shall survive the termination of this Access Agreement for any reason until the applicable statute of limitations has run.

**11.0**    **Notice/Contact Information.**  Any notice, request, order or demand required or permitted to be given under this Access Agreement to either Party, other than a request for service, shall be in writing and conveyed to the Party to be notified at the email address set forth on the signature page hereto, and be deemed given upon sending.  Either Party may change its email address to which Notice is to be given to it by giving written notice as provided above of such change of email address.

**12.0**    **Miscellaneous.**

**12.1**    Governing Law; Jurisdiction. This Access Agreement and the rights and obligations between the Parties shall be governed by, construed in accordance with, and enforced under the laws of the State of Louisiana without giving effect to its conflicts of law provisions.  The Parties irrevocably and unconditionally consent and agree to submit to the exclusive jurisdiction of the State or Federal courts located in Baton Rouge,

Classified as: PRIVATE AND CONFIDENTIAL

Louisiana.   The Parties further irrevocably and unconditionally waive any objection based upon lack of personal jurisdiction, improper venue or forum *non conveniens* in this jurisdiction and consent to the granting of such legal or equitable relief as is deemed appropriate by the federal courts in this jurisdiction.

**12.2**    Severability. If any provision of this Access Agreement is determined to be invalid or unenforceable, such invalidity or unenforceability will not affect any other provision of this Access Agreement.  In that event, the Parties agree to amend or reform this Access Agreement to effect as closely as possible the original intent of the Parties.

**12.3**    Entire Agreement; Amendment; Waiver.    This Access Agreement and Schedule I constitute the entire agreement between the Parties regarding the transactions contemplated herein.  Any previous agreements and understandings between the Parties regarding these transactions, whether written or oral, are superseded by this Access Agreement.  Any amendment or waiver of any requirements and/or provisions of this Access Agreement must be in writing and signed by an officer or authorized representative of each Party.

**12.4**    Assignment.  This Access Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.   Invitee may not assign this Access Agreement nor grant any rights hereunder, nor shall activities by performed under this Access Agreement by a contractor or subcontractor of Invitee, without the express prior written consent of Impala.

**12.5**    Counterparts.  This Access Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.  To the maximum extent permitted by law, any document may be signed and transmitted by facsimile with the same validity as if it were an ink-signed document.

[SIGNATURE PAGE FOLLOWS.]

**IN WITNESS WHEREOF**, the Parties hereto have caused this Access Agreement to be duly executed by their respective authorized signatories as of the Effective Date.

**IMPALA TERMINALS BURNSIDE LLC**                    **INVITEE**

By:                                                   By: _____
Name: _____                    Name: _____
Title: _____                   Title: _____

Notice Information:                                   Notice Information:

Impala                                                Invitee
                                                      Attention: _____
Attention: Terminal Manager                                      _____
                                                                 _____
Email:                                                Telephone: _____
Allen.Walker@impalaterminals.com                      Email: _____
                                                      SCAC Code: _____
                                                      EIN: _____
                                                      State License Number/Transporter's Number:
                                                      _____

With a mandatory copy to:

Attention: General Counsel
HoustonLawyers@trafigura.com

### SCHEDULE I

**Insurance**

1   <u>Insurance Required by Invitee</u>.  Invitee shall obtain at its sole cost and expense and shall carry and maintain in full force and effect, and cause its Agents to obtain and maintain, insurance coverages with insurance companies rated not less than A-, IX by A.M. Best or otherwise reasonably satisfactory to Impala of the following types and amounts:

  a.     Workers Compensation Insurance for statutory limits and in accordance with the Laws and Regulations of the state(s) where the work or operations under this Access Agreement are to be performed, including, without limitation, U.S. Longshore and Harbor Workers Compensation Act as well as the Outer Continental Shelf Lands Act with Volunteer Compensation for marine operations to include transportation, wages, maintenance and cure, and Jones Act Coverage where required;

  b.     Employer's Liability Insurance in the following minimum limits:

    i.      Bodily injury by accident – $1,000,000 per accident;

    ii.     Bodily injury by disease – $1,000,000 each employee; and

    iii.    Bodily injury by disease – $5,000,000 policy limit.

  c.     Commercial Auto Liability Insurance covering each vehicle whether owned, non-owned, hired, operated, or used by Invitee and/or any Agents while in, on or adjacent to the Terminal, with a combined single limit of not less than one million dollars ($1,000,000) for bodily injury and property damage as to any one accident, including an MCS-90 endorsement (if applicable).

  d.     Commercial General Liability Insurance including coverages for contractual liability, third-party personal injury liability, and sudden and accidental pollution, with limits of not less than one million dollars ($1,000,000) combined single limits each occurrence.

  e.     Excess Liability Insurance in excess of the insurance coverages required at Sections 10.2 (b), (c), and (d) above, with a limit of not less than five million dollars ($5,000,000) per occurrence.

2   <u>Certificates of Insurance, Endorsements</u>.  Invitee shall cause Impala Group (as defined below) to be named as an additional insured on all policies of insurance secured by Invitee and its Agents in accordance with this Access Agreement.  Invitee shall furnish Impala with certificates of insurance evidencing this coverage.  All policies shall be endorsed to provide that no material change or cancellation of the coverage shall occur until Impala has received thirty (30) days written notice.  Invitee hereby waives, and shall cause its insurers and those of the Agents to also waive any right of subrogation that they may have against Impala Group.  All insurance coverage required hereunder shall be primary to, and not in excess of or contributory with, any insurance that may be maintained by Impala.

*Impala Terminals Burnside Rules and Regulations*
*Effective: February 1, 2021*

Schedule C:

| Service | Fee Description | Berth | Buoy |
|---|---|---|---|
| Dockage | | 0.60 Per GRT Per 24 Hour Period subject to minimum charge of $7,500 per day | 0.60 Per GRT Per 24 Hour Period subject to minimum charge of $7,500 per day |
| | Vacate Berth or Detention | 115% of then-current hourly dockage | 115% of then-current hourly dockage |
| Towage | Docking/Undocking | $3500.00 Per Tug | $3950.00 Per Tug |
| | Reporting Fee | $2,000.00 Per Tug | $2250.00 Per Tug |
| | Warping Assistance | $975.00 Per Hour | $975.00 Per Hour |
| | Hold In Tugs | $975.00 Per Hour | $975.00 Per Hour |
| | Tug Delays / Standby | $975.00 Per Hour | $975.00 Per Hour |
| | Tractor Tugs | 1.5 Times the applicable rate above | 1.5 times the applicable rate above |
| Line Handling | Docking/Undocking | $3500.00 Includes In And Out | $4000.00 Includes In And Out (double during high water) |
| | Delays after one hour/Stand by fee | $225.00 per hour | $500 per hour |
| | Re-Tie Cost/Reporting fee | $1750.00 | $2250.00 |
| Launch Service | | $1200.00 Per Day | $1200.00 Per Day |
| Security Fees | | $1250.00 Per Day | $950.00 Per Day |
| | Fuel Surcharge | One (1%) Percent For Each 3¢ Per Gal. | One (1%) Percent For Each 3¢ Per Gal. |
| | Fuel Base Cost | $2.00 Per Gal. | $2.00 Per Gal. |
| | Bunkers | Permitted with prior notice or arrangement | Permitted with prior notice/arrangement |
| Barges | Cover Handling | $1,250 per occurrence not including shifting fees | N/A |
| | Barge Pumping | $750 per occurrence | N/A |
| Mid Stream Crane | Stand by (Delay) | $1,200 per hour | N/A |

{N3564250.1}