# Exhibit C

# FIRST AMENDMENT TO TERMINALING AND THROUGHPUT AGREEMENT

This Amendment to the TERMINALING AND THROUGHPUT AGREEMENT, is defined below ("First Amendment"), effective as of October 30, 2024, by and between **Avanza Trading LLC,** a Delaware limited liability company ("Product Owner"), and **Impala Terminals Burnside LLC,** a Delaware limited liability company ("Impala).; Product Owner and Impala hereinafter sometimes referred to individually as a "Party" and collectively as "Parties".

## WITNESSETH

**WHEREAS**, Product Owner and Impala entered into that certain Terminaling and Throughput Agreement of November 27, 2023 pursuant to which Product Owner agreed to the loading of coal and Impala agreed to provide services for the handling, storage, loading and various services of the coal (the "Agreement"); and

**WHEREAS,** Product Owner and Impala have agreed to amend the Agreement as further described in this First Amendment.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby amend the Terminaling And Throughput Agreement as follows:

1. Page 1, "**WHEREAS**, Product Owner desires to arrange for the loading of 1,200,000/10% Metric Ton of coal; and" shall be deleted in its entirety and replaced with the following:

    "**WHEREAS**, Product Owner desires to arrange for the loading of at least 2,000,000 Metric Tons of coal or Petcoke over the initial 3 year term of the Agreement ("Metric Ton Minimum"); and"

2. The Parties agree to add the following statement at the end of **Section 4. THROUGHPUT CAPACITY AND STOCKPILE STORAGE**:

    "For the avoidance of doubt, there are no extra storage charges due to Impala by the Product Owner as long as Product Owner is within its Agreement storage capacities and within the terms of the this Agreement."

3. **Section 5. SCHEDULES** shall be deleted in its entirety and replaced with the following:
    
    "5.    **SCHEDULES**.

    (a)    Planning Schedules. In addition to the reports and schedules required by the Tariff, no later than thirty (30) days prior to the anticipated date of Product Owner's first delivery of Product to the Terminal, Product Owner shall provide to Impala, for operational planning purposes, its anticipated deliveries of Product for the next six (6) Months. At least seven (7) days prior to the end of

each Month, Product Owner shall submit, in writing, any modifications to the previously delivered six (6) Month schedules. All such schedules shall be subject to prior written approval by Impala, which approval shall not be unreasonably withheld.

(b)     Contested Schedules.  If Impala withholds its approval of any of the proposed schedules, Product Owner and Impala shall use their reasonable efforts to determine a mutually agreeable schedule.

(c)     Laycan and Schdueling.  Product Owner shall abide by the Tariff for booking procedures and vessel dimensions. Impala will accept "Notice of Readiness" when properly presented as defined in the Tariff.

Product Owner is to provide Impala, in writing, a seven (7) day laycan spread at least thirty (30) days prior to the date of the first day of the seven (7) day laycan spread. No later than fourteen (14) days from the date of the first day of the original seven (7) day laycan spread, Product Owner is to identify in writing to Impala a four (4) day load window within such original seven (7) day laycan spread. In each case mentioned above, the written approval of Impala shall be required relative to the seven (7) day laycan and the four (4) day load window within the original seven (7) day laycan. Acceptance by Impala of a nomination of a Vessel shall be evidenced by Impala's confirmation by facsimile or e-mail transmittal to the Vessel Party (as such term is defined in the Tariff).

Product Owner may cancel a scheduled laycan spread without penalty by providing written notice of such cancellation to Impala at least twenty-one (21) days prior to the first day of the scheduled laycan spread. If Product Owner cancels a laycan spread less than twenty-one days prior to the first day of such laycan spread, Impala shall be entitled to a "Cancellation Penalty" for Product Owner's account. The Cancellation Penalty is assessed per Vessel and is equal to one (1) days dockage per the tariff.

If Product Owner schedules a four (4) day loading window, it may cancel such scheduled loading window seven (7) days or more prior to the first day of the scheduled loading window and incur only the Cancellation Penalty. If Product Owner fails to cancel a scheduled loading window at least seven (7) days prior to the first day of the scheduled loading window, and Product Owner does not execute load out to Vessel during that loading window, Impala shall be entitled to a "Window Cancellation Penalty" equal to two (2) days dockage per the tariff for Product Owner's account in place of the Cancellation Penalty."

4. Page 7 **"Section 6. VESSEL UNLOADING AND LOADING**.
   b. Discharge of Barges.
      (i)     Impala shall be entitled to three (3) free Days to discharge Product from the Product Owner's barges that have been designated for storage (the "Free Period"). The parties agree that the terminal shall not be obligated to unload more than 8 barges per calendar day

when accounting for the total free days of any barges placed for discharge to ground storage." shall be deleted in its entirety and replaced with the following:

==**"Section 6. VESSEL UNLOADING AND LOADING**.==
    ==b.  **Discharge of Barges.**==
        ==(i)  Impala shall be entitled to four (4) free Days to discharge Product from the Product Owner's barges that have been designated for storage (the "Free Period"). The parties agree that the terminal shall not be obligated to unload more than ten (10) barges per calendar day when accounting for the total free days of any barges placed for discharge to ground storage."==

5. **Exhibit A, Services and Fees** shall be deleted in its entirety and replaced with the following:

**Exhibit A**

**Services and Fees**

| Services |  |
|---|---|
| The following items shall compromise the Services: |  |
| **List of Items included in Services** | **Notes** |
| 1. Stockpiling | Segregated stockpiling and normal, routine maintenance thereof |
| 2. Storage | Storage of the Product. |
| 3. Unloading | From a river-barge Vessel to the stockpile |
| 4. Loading | From a river-barge Vessel or the stockpile to an ocean-going Vessel |
| 5. Commingling | Per Product Owner's reasonable written instructions. |
| 6. Product | ==Coal or Petcoke== |

| **Fees** ||
|---|---|
| 1. Rate and Unit of Measure<br>   a. Vessel Unloading and Loading fee<br>   b. Cargo Unit Basis for Invoicing<br>   c. Volume<br>   d. Term | a/b:  Rate $3.50 stockpile to vessel  per Metric Ton<br><br>c:  Two  zones up to 30,000 metric tons of storage per each zone. Starting January 1, 2025, three (3) zones comprised of 1 zone of up to 45,000 metric tons and two (2) zones of up to 50,000 metric tons each.<br><br>d:  From 01 January 2024 – 31 December 2026<br><br>The Term of the agreement shall extend in its entirety through 31 December 2029 if the Product Owner notifies Impala no later than September 20, 2026; at the time of notification of Term extension, Product Owner shall also notify how many zones, up to three (3), they intent to use over the extended Term. |
| 2. Vessel Guaranteed Loading Rate | SHINC<br>40,000 for material loading from ground storage to vessel and material is being reclaimed from at least two (2) separate zones.<br>35,000 for material loading from ground storage to vessel and material is being reclaimied from only one (1) zone.<br>15,000 for material loading barge direct to vessel<br><br>These guaranteed loading rates based on normal terminal operations, open hopper barges. Any special requests, ie, soft loading, slow loading, etc, can negate the above guarantees. |

Page **4** of **7**

| | |
|---|---|
| 3. Piles, Capacity, Storage Freetime and Fees, if applicable | Number of piles and stockpile configuration will be at Impala's discretion depending on the tonnage that Product Owner conveys to Impala for handling as long as Product Owner has access to and use of its contracted storage capacity during the Term.<br><br>==Should Impala have adjacent storage space available and designated for Product Owner to use for its agreed number of stockpiles, then Impala and Product Owner shall cooperate to maximize the potential storage and blending plan such that the Product Owner may exceed its ground storage maximums, as applicable and agreed between the parties.== |
| **Ancillary Service Fees:** | |
| 4. Section 11(f) (i) | $5,000/day flat rate for any left over tonnage after 05 January 2027 if Term is not extended. Should Product Owner extend the term, then $5,000/day flat rate for any left over tonnage after 05 January 2030 |

| | |
|---|---|
| 5. Minimum Throughput | Product Owner will ship a minimum of 2,000,000 Metric Tons under the initial terms of this Agreement by December 31, 2026, the Metric Ton Minimum.  Any shortfall of this tonnage will be charged the full rate at the end of the term, with credit given for tons To Ship prior to any other tons IF the Product Owner has extended the Agreement through Decembert 31, 2029. The shortfall shall be calculated as follows:<br><br>Shortfall Payment:  If, at the end of the initial Term, Product Owner has failed to move through the Terminal the Metric Ton Minimum, then within ten (10) days as from receiving an invoice therefore from Impala, Product Owner shall pay Impala an amount equal to: (i) the Metric Ton Minimum minus the actual volume of Product unloaded from Product Owner during the term, multiplied by (ii) the Rate ($3.50) (the "Shortfall Payment"). The Shortfall Payment shall be paid within thirty (30) days of the end of the Term.<br><br>==Should the Product Owner extend the term through December 31, 2029, then the Metric Ton Minimum shall be increased by 720,000 Metric Tons for the 45,000 metric ton zone and 1,200,000 for each 50,000 metric ton zone that is elected by the Product Owner for the duration of the Extended Term.  Should all three (3) zones be nominated for the Extended Term, then the new Metric Ton Minimum commitment shall be 5,120,000 Metric Tons and shall apply for any calculation of a Shortfall Payment at the end of the Extended Term.== |
| 6. 2023 Shortfall: | Product Owner to pay 30% of 2023 shortfall payments when due, with credit for tons to ship under the volume commitment (first tons shipped in 2024 to meet the 2023 annual minimum at applicable 2023 rate). |

**IN WITNESS WHEREOF,** the Parties hereto have caused this First Amendment to be duly executed as of the day and year first written above.

**Avanza Trading LLC**

By: *Andy Smolenack*
Title: Trader

**Impala Terminals Burnside LLC**

By: *[signatures]*
   Corey Prologo    Robert Kreider
Title: Directors