Exhibit G



# Terminal Rules & Regulations

**Ascension Bulk Terminal, LLC**

**5050 Highway 44**
**Darrow, Louisiana 70040**

**Effective Date:  January 1, 2026**

## INDEX

|      |                                                          | Page No. |
|------|----------------------------------------------------------|----------|
| **1** | **GENERAL RULES AND REGULATIONS** | 3 |
| 1.1  | INTRODUCTION                                             | 3 |
| 1.2  | DEFINITIONS                                              | 3 |
| 1.3  | APPLICATION OF THE RULES; AMENDMENTS TO THE RULES       | 4 |
| 1.4  | CONSENT TO THE TERMS OF THE RULES                       | 4 |
| 1.5  | INTERPRETATION                                          | 4 |
| 1.6  | COMPLIANCE AND LOCAL AUTHORITY                          | 4 |
| 1.7  | HOURS OF OPERATION                                       | 4 |
| 1.8  | VESSEL SIZE                                             | 5 |
| 1.9  | OUTAGES                                                 | 5 |
| 1.10 | HOLD HARMLESS AND INDEMNIFICATION AGREEMENT             | 5 |
| 1.11 | LAW AND JURISDICTION                                    | 6 |
| 1.12 | REMEDIES FOR ENFORCEMENT                                | 6 |
| **2** | **VESSEL REQUIREMENTS ASSOCIATED WITH CARGO HANDLING OPERATIONS** | 6 |
| 2.1  | VESSEL NOMINATION                                        | 6 |
| 2.2  | NOTICE OF READINESS                                      | 7 |
| 2.3  | LAYTIME                                                 | 7 |
| 2.4  | VESSEL ACCESS                                           | 8 |
| 2.5  | SHIFTING AND READINESS                                  | 8 |
| 2.6  | RETENDERING                                             | 9 |
| 2.7  | VESSEL ROTATION                                         | 9 |
| 2.8  | VESSEL SAFETY AND SECURITY                              | 9 |
| 2.9  | SAFE BERTH                                              | 10 |
| 2.10 | CARGO OR DEBRIS ON DECK OF VESSEL                       | 10 |
| 2.11 | LINE HANDLING                                           | 10 |
| 2.12 | USE OF TUGS                                             | 10 |
| 2.13 | STOWAGE                                                | 11 |
| 2.14 | BUNKERS                                                | 11 |
| 2.15 | VACATING BERTH                                          | 11 |
| 2.16 | LIQUIDATED DAMAGES                                      | 12 |
| **3** | **RIVER BARGE REQUIREMENTS AND ASSOCIATED CARGO HANDLING OPERATIONS** | 12 |
| 3.1  | MOORING OF BARGES                                       | 12 |
| 3.2  | CONDITIONAL ACCEPTANCE OF RIVER BARGE                   | 13 |
| 3.3  | CARGO ON DECK OF RIVER BARGE                            | 13 |
| 3.4  | RIVER BARGE FLEETING AND SHIFTING CHARGES              | 14 |
| 3.5  | RIVER BARGE COVER HANDLING                             | 14 |
| 3.6  | RIVER BARGE RELEASE                                     | 14 |
| 3.7  | RIVER BARGE CARGO MINIMUM                              | 15 |
| 3.8  | RIVER BARGE LIMITATIONS/REQUIREMENTS                   | 15 |
| 3.9  | RIVER BARGE NOMINATION REQUIREMENTS                    | 15 |
| 3.10 | ADDITIONAL CHARGES                                      | 15 |

## EXHIBITS

| **EXHIBIT A** | **USER FEE SCHEDULE** | 16 |
|---------------|-----------------------|----|
| **EXHIBIT B** | **RIVER BARGE SERVICE RATES** | 18 |
| **EXHIBIT C** | **BERTH APPLICATION** | 19 |

1.    **GENERAL RULES AND REGULATIONS**

1.1    **INTRODUCTION**

These Terminal Rules and Regulations (the "**Rules**") are published by Ascension Bulk Terminal, LLC ("**ABT**") and contain rules, regulations, rates, and other charges applicable to the use of ABT's dry-bulk cargo terminal located at LMR Mile 169 as well as the terminal's fleets, anchorages and all other associated appurtenances and facilities (collectively, the "**Terminal**").

ABT is a privately-owned company and is not affiliated or associated with any city, state, or federal agency.  Therefore, the use of the Terminal is by private contract by and between ABT and User.

1.2    **DEFINITIONS**

As used herein, the following terms shall have the meaning set forth in these definitions.

"***Barge Carrier***" shall mean any owner, operator, charterer, or agent of a River Barge calling at the Terminal.

"***Cargo***" shall mean any material to be loaded, unloaded, stored, or transferred within the Terminal, as specified in the commercial terms.

"***Customer Contract***" shall mean a written agreement between ABT and User.

"***Force Majeure***" shall mean any occurrence or circumstance which delays or prevents any party from fulfilling any or all of its obligations and which arises out of or is attributable to: Acts of God; acts of public enemy; insurrection;  riots;  labor disputes, strikes, lockouts, or other industrial disputes on a nation-wide or industry-wide basis, but not otherwise (for which neither party shall be required to accede to the demand of labor or labor unions which it considers unreasonable); fire; lack of utility provided power service; explosions; high or low river; floods; catastrophic failure of equipment or facilities that prevent the loading or discharge of Cargo; embargo; orders or acts of civil or military authority; or catastrophic failures or breakage in hull, machinery, equipment or appliances.  In all cases the foregoing "Force Majeure" occurrences or circumstances shall be limited to those which are beyond the reasonable control of the parties.

"***River Barge***" shall mean any inland River Barge intended to load or discharge Cargo at the Terminal.

"***Shipper***" shall mean the owner, consignee or consignor of any Cargo to be handled at the Terminal, including any agent, representative or other party authorized to and acting on behalf of any Cargo interest, in connection with the transfer, storage and handling of Cargo at the Terminal.

"***ABT***" shall be interpreted to include ABT's owners and all directors, officers, employees, agents, representatives, any third parties acting on ABT's behalf, all contractors and subcontractors of ABT, and, without limitation, ABT's associated or affiliated companies and any subcontractors thereof.

"***User***" shall include any Vessel (as defined below), Shipper, receiver, motor-carrier, rail-carrier, Barge Carrier, any other third party that is engaged in or doing business with ABT, any third party that is brought to or instructed to appear at the Terminal by any Vessel, Shipper, receiver, motor-carrier, rail-carrier, or Barge Carrier, or any third party that is otherwise present at or using the Terminal in any form whatsoever, including, without limitation, any associated or affiliated

3

companies and subcontractors of any of the foregoing.

*"Vessel" or "Vessels"* shall mean any ocean-going ship or ocean-going barge that is intended to load or discharge Cargo at the Terminal. All references to "Vessel" or "Vessels" in these Rules shall include, unless specified otherwise, the owner(s), operator(s), manager(s), charterer(s), master(s), and/or agent(s) of such Vessel or Vessels, as applicable.

### 1.3    APPLICATION OF THE RULES; AMENDMENTS TO THE RULES

Unless varied by written agreement between ABT and User, the rates, rules, and regulations contained in these Rules shall apply equally to all Users of the Terminal and shall apply to all services provided on or after the effective date shown on these Rules or any amendments thereto.

Amendments to these Rules may be issued from time to time, and these Rules are subject to change without prior notice. All such amendments or changes will be published in the same manner as these Rules.

### 1.4    CONSENT TO TERMS OF THE RULES

The use of any portion of the Terminal shall constitute a consent to these Rules, and such use shall evidence an agreement on the part of any User to pay all charges specified in these Rules and be governed by all terms and conditions contained herein. Notwithstanding anything to the contrary herein, the rights of any User to utilize the Terminal shall be subject to the prior approval of ABT.

### 1.5    INTERPRETATION

ABT shall be the sole judge as to the interpretation of these Rules.

### 1.6    COMPLIANCE AND LOCAL AUTHORITY

User agrees to comply with all federal, state, and local laws, statutes, ordinances, rules, permits conditions, policies, and regulations applicable to the Terminal, as well as all other federal and state laws concerning the waterways adjacent to the Terminal.

The Terminal is within the jurisdiction of the Port of Greater Baton Rouge, Ascension Parish, and all rates, rules, regulations, and requirements of the Port of Greater Baton Rouge. For the avoidance of doubt, rates and charges set forth in these Rules are net and are in addition to all other rates, charges and impositions that may be imposed by the Port of Greater Baton Rouge, or other governmental and non-governmental agencies. Rates, rules, requirements, and regulations of the Port of Greater Baton Rouge, Ascension Parish, can be found here: https://www.portgbr.com/tariffrates

If any User fails to comply with all such laws and regulations, the Terminal may order any User to vacate the Terminal or berth. If the User does not vacate the berth when so ordered, the User will be subject to all costs (including, but not limited to attorneys' fees) and expenses in connection with the moving of the Vessel, which costs, and expenses (and applicable liquidated damages) shall be for the account of and the full risk of the User.

### 1.7    HOURS OF OPERATION

The Terminal operates twenty-four (24) hours a day, every day throughout the year except for Super Holidays or closures for repairs/maintenance. For purposes of these Rules, "**Super Holidays**" shall

4

be defined as:

> New Year's Day
> Martin Luther King, Jr. Day
> Mardi Gras Day
> Memorial Day
> Independence Day (July 4th)
> Labor Day
> Thanksgiving Day (4th Thursday in November)
> Christmas Day (December 25th)

When any of the above Super Holidays fall on Sunday, the following Monday shall be observed as the Super Holiday. When one of the above Super Holidays falls on Saturday, the preceding Friday will be observed as the Super Holiday. Super Holidays will be considered from 18:00 the day prior to the observed Super Holiday and extend through 06:00 the day following.

## 1.8    VESSEL SIZE

ABT can accept Vessel nominations at the Loading Dock and Midstream Buoys with the following restrictions:

|  | Loading Dock | Midstream Buoys |
|---|---|---|
| Beam | 141' | 105'6" |
| LOA | 886' | 755' |
| Air Draft (WLHC) | Less than 61' | Less than 54' |
| Draft* | 50' | 50' |

Air draft at Loading Dock 1 is to mean WLHC (water line to top of hatch coaming) less the river condition at Donaldsonville gauge,  https://water.noaa.gov/gauges/don1
*When the Donaldsonville gauge reads 5' or less, the maximum draft at the Loading Dock and Midstream Buoys is 47'

Vessels larger than the above require prior written consent from ABT.

## 1.9    OUTAGES

ABT reserves the right to four (4) planned maintenance outages annually, one per calendar year quarter. Each outage will not be longer than seven (7) days. ABT will provide Shipper with no less than sixty (60) days' notice prior to the first day of a planned outage. Without prior written consent, ABT will not receive River Barges or Vessels during outages. ABT will not be held responsible for Free Time lost or demurrage incurred during outages. Outage periods arising from or in connection with planned maintenance shall not be grounds to declare a Force Majeure.

## 1.10    HOLD HARMLESS AND INDEMNIFICATION AGREEMENT

All Users of the Terminal, specifically and without limitation, agree to hold harmless, defend and indemnify ABT, its parents, subsidiaries, divisions, affiliates and joint ventures, and its/their

5

respective officers, directors, agents, employees and insurance underwriters, as well as other entities which may manage, own, control or operate the Terminal (the "ABT Indemnitees"), from and against any and all disputes, claims, liability (including, but not limited to, absolute or strict liability), causes of action, damages (including, but not limited to, punitive damages) and expenses (including, but not limited to, the payment of reasonable attorney fees, expert witness fees and litigation expenses regardless of type), in connection with any loss of life, bodily injury, impairment of health, pollution and/or damage to or loss of property, directly or indirectly arising out of, related to, and/or resulting from the User's (i) activities or operations at any part of the Terminal; (ii) use of any part of the Terminal; (iii) storage of any cargo at the Terminal; or (iv) the breach of any federal, state, and local laws, statutes, ordinances, rules, permit conditions and regulations applicable to the Terminal or these Rules. Users agreement to hold harmless, defend and indemnify the ABT Indemnitees shall apply even if the event or loss in question is caused by the sole or concurrent negligence of any ABT Indemnitee, the unseaworthiness of any vessel, and/or because of any pre-existing deficiency or defect, hidden or otherwise, of any portion of the Terminal, unless such loss of life, bodily injury, impairment of health and/or damage to or loss of property is caused by the gross negligence of willful or wanton misconduct of a ABT Indemnitee.

### 1.11     LAW AND JURISDICTION

Any and all disputes, claims, liability (including, but not limited to, absolute and strict liability), causes of action, damages (including, but not limited to, punitive damages), or expenses (including, but not limited to, the payment of reasonable attorney fees, expert witness fees, and litigation expenses regardless of type), directly or indirectly arising out of, related to, and/or resulting from the User's operation at or use of any part of the Terminal, storage of Cargo at the Terminal or breach of these Rules, which cannot be resolved amicably, shall be governed by the general maritime law of the United States, and, to the extent not inconsistent or where otherwise not covered, the laws of the State of Louisiana, excluding its conflicts of law provisions. All such claims and disputes shall be subject to the exclusive jurisdiction of the United States District Court for the Eastern District of Louisiana, New Orleans, Louisiana Division. If that court lacks subject-matter jurisdiction, then exclusive jurisdiction shall rest with the 24th Judicial District Court in Jefferson Parish, State of Louisiana. All Users submit themselves to the personal jurisdiction of said courts. In the event ABT must move to dismiss a lawsuit filed in violation of this provision, the reasonable attorneys' fees and costs incurred by ABT in so moving shall be paid by the plaintiff(s) to said lawsuit.

### 1.12     REMEDIES FOR ENFORCEMENT

ABT shall have all remedies available to it at law to enforce these Rules. In the event of any legal proceedings to enforce any provision of these Rules in which ABT is the prevailing party, ABT shall be entitled to recover its expenses incurred in such proceedings, including, but not limited to, payment of reasonable attorney fees, costs, expert witness fees, and litigation expenses regardless of type.

## 2.     VESSEL REQUIREMENTS ASSOCIATED WITH CARGO HANDLING OPERATIONS

### 2.1     VESSEL NOMINATION

Vessel Nominations shall be submitted per ABT's Transportation Terms and Conditions or the Customer Contract. If not covered by the Transportation Terms and Conditions or Customer Contract, the nomination of a Vessel and the loading instructions shall be furnished by the Shipper to the Terminal via email at abt-dispatch@hostterminals.com between 7:30 a.m. and 4:00 p.m. Mondays thru Fridays, excluding Super Holidays, which nomination shall identify the laycan window for loading.  Acceptance of a nominated Vessel shall be provided in writing to Shipper

within one business day of nomination.  ABT shall have no obligation to accept a Vessel not properly nominated within the time period set forth above.

## 2.2     NOTICE OF READINESS

In order for a Vessel to submit the Vessel's Notice of Readiness, the Vessel must perform the following (collectively, the "**Notice of Readiness**" or "**NOR**"):

    A.  Submit the Berth Application to ABT (included as Exhibit C);

    B.  Pay all Vessel fees in advance as required by ABT's pro forma invoice;

    C.  Be cleared by U.S. Customs and Border Protection;

    D.  An initial draft survey has been completed, if required by Shipper, and all holds on the Vessel have been inspected and found suitable by a marine surveyor, if required by Shipper;

    E.  Provide ABT with a copy of the stowage plan and load sequence that has been approved by ABT's contractual customer;

    F.  Arrive at the closest available position in this order:

        1.  ABT designated loading berth
        2.  ABT designated lay berth
        3.  Burnside Anchorage
        4.  Alternate anchorages Grandview or White Castle;

    G.  All Cargo to be loaded for the Shipper is ready and available at ABT for loading.

Under no circumstances will ABT acknowledge a Notice of Readiness for any Vessel outside of the above positions or anchorages without written approval from ABT.

Unless waived by ABT, a Vessel will not be called to berth until and unless the Notice of Readiness is complete, meets all the above conditions, and is tendered to ABT. Documents and notices shall be sent via email to abt-dispatch@hostterminals.com .

## 2.3     LAYTIME

Vessels will be loaded at the Load Rates in the Customer Contract. Vessel laytime shall commence twelve (12) hours after written "Notice of Readiness" is accepted confirming the Vessel is: (i) ready in all respects to receive Cargo in all holds to be loaded, (ii) within its laycan window, and (iii) in accordance with the Terminal Rules and Regulations  as provided by ABT management. The Load Rates are subject to the following:

    A.  Time consumed by the Vessel in moving from port anchorage to the berth, including waiting for tide, traffic, daylight, congestion, pilot availability or other causes not controlled by the Terminal, or stopping enroute for the purposes of taken on Pilots, supplies or bunkering to be excluded;

    B.  All time required by the Vessel to complete paperwork, open hatches, time consumed during draft surveys or draft checks, time waiting for pilots, tugs or linemen, or any other

reason the Terminal is unable to load or unload the vessel, as a result of the Vessel's action or inaction excluded;

C.   If loading starts before the completion of the 12-hour period after NOR, then only actual time used shall count as laytime until expiration of such time;

D.   Any delay due to inability of the Vessel's facilities to safely discharge or receive Cargo for any reason to be excluded;

E.   Any time consumed in interruption of transportation operations due to the Vessel's failure to comply with terminal regulations excluded;

F.   Delay due to prohibition of Cargo transfer at any time by the Vessel, the owner or operator of the Vessel, or by governmental authorities, unless such prohibition is caused by ABT's failure to comply with applicable laws, time to be excluded;

G.   Any delay caused by strike, lockout, stoppage or restraint of labor of the Master, officers and crew of the Vessel or pilots or any delay for which a Vessel, her Master or crew is responsible time excluded; or

H.   Any delay caused by conditions not reasonably within ABT's control, including but not limited to, lack of required shipping documents, weather, equipment failure, Force Majeure, blockage of channels caused by accidents or spills, delays in voyages caused by Pilot Association's requirements, etc. excluded.

## 2.4   VESSEL ACCESS

All Vessels are to furnish, at all times while in berth, safe access onboard. To the extent the Vessel's personnel or other visitors, including the Vessel's agent, need to leave or board the Vessel, twenty-four (24) hours prior written notification to ABT must be provided and include a list of the: (a) name; (b) telephone number; and (c) reason for visit of each visitor to the Vessel and Vessel personnel leaving the Vessel provided along with a crew list. Each visitor must have a form of identification acceptable to ABT and consistent with applicable federal law. Said list shall be supplemented as needed and furnished in advance of the visit to the Terminal in writing between 9:00 a.m. and 4:00 p.m. Mondays through Fridays and between 9:00 a.m. and 12:00 noon Saturdays, excluding Super Holidays as defined herein (the "**Visitor List**"). The Visitor List must be approved by ABT prior to Vessel personnel leaving or visitors boarding the Vessel.

## 2.5   SHIFTING AND READINESS

Assignment of berth under these Rules is predicated upon: (a) Vessel's continuous readiness twenty-four (24) hours a day, seven (7) days a week to receive or discharge Cargo at Terminal's full normal load rate throughout the entire time in berth and in compliance with the directions of Terminal management, including shifting within or between anchorage sites or berths; and (b) the availability of sufficient Cargo to complete loading of the Vessel. Vessels shall be prepared to come to berth and commence loading or unloading operations, as the case may be, upon three (3) hours' notice. Upon assignment to a berth, the Vessel shall remain prepared and be properly crewed to promptly carry out Cargo transfer operations within or between Terminal berths and undock and vacate the berth on ABT's order twenty-four (24) hours a day, seven (7) days a week. For purposes of these Rules, "promptly" shall mean within thirty (30) minutes of a notice being tendered by the Terminal. If the Vessel is unable to maintain its readiness while alongside the berth, then the Vessel shall be responsible for liquidated damages of $7,500 for each

hour or fraction thereof until the Vessel reestablishes its readiness.

If the Vessel is ordered to berth and a delay in delivery of the Vessel to berth occurs in excess of three (3) hours from the time that the Vessel was ordered to berth, then the Vessel, shall be responsible for an empty berth charge of $7,500 for each hour or fraction thereof until the Vessel is moored in the berth, regardless of intervening circumstances of any nature, which charge shall be assessed as liquidated damages.

Any Vessel which is required to shift within the Terminal will be responsible for all expenses pertaining to shifting, including, but not limited to, line handling, pilot, and tug(s), or any other fees, unless shifting is ordered by ABT outside the course of normal operations.

Normal and seasonal high-water and increased currents are probable along the Lower Mississippi River. By berthing in any of the Terminal's mooring locations, the Vessel acknowledges the responsibility to be aware of the condition of high water.

## 2.6     RETENDERING

If any Vessel that has tendered a Berth Application at the Terminal is ordered to berth by ABT and is unable or refuses to accept a berth, due to any reason whatsoever, or otherwise fails to comply with these Rules, ABT may, at its sole discretion, cancel the Vessel's original tender. If tender is not accepted, the Vessel must retender and will be assigned a rotation in the Terminal lineup based on the new tendering time. The Vessel shall be responsible for an empty berth charge of $7,500 for each hour or fraction thereof until another Vessel (substitute or not) is moored in berth, regardless of intervening circumstances of any nature, which charge shall be assessed as liquidated damages.

## 2.7     VESSEL ROTATION

The Terminal management may alter the turn of the Vessels for loading or unloading, when, in Terminal's sole judgment, it is in the best interest of Terminal operations.

## 2.8     VESSEL SAFETY AND SECURITY

All Vessels are to furnish at all times while in berth, safe ingress and egress, lighting, and equipment to permit loading and unloading. When a Vessel is berthing at any of the Terminal facilities, the Vessel's Master shall be solely responsible for the safety of the Vessel and her crew. Any Vessel in berth shall at all times maintain appropriate officers and crew aboard the Vessel in order to maintain an alert watch and respond to emergencies. Moreover, Terminal's consent, as described more fully in these Rules, shall be obtained before any crew or any other individual will be allowed on any Terminal facilities, docks and/or buoys.  The Vessel shall comply with the following:

A.  The Vessel must be maintained in a state of readiness to respond to emergency situations and to avoid delays in vacating the berth.

B.  Guards must be installed to prevent ballast water from contacting personnel, equipment, or the dock.

C.  All personnel shall wear life jackets, hard hats and all generally accepted safety equipment and gear while on the docks at all times. It is the Vessel's responsibility to provide life jackets, hard hats, and all generally accepted safety equipment and gear. Vessel crew members shall adhere to this requirement when on the dock and when

transiting the conveyor walkway system to and from the docks.

D.  In compliance with United States Coast Guard, Department of Homeland Security directives, 33 CFR 105, ABT has developed a Facility Security Plan ("FSP"). According to ABT's FSP, certain areas of the Terminal's landside facilities and all of ABT's berths and fleets are considered restricted areas. Anyone or anything entering into the Terminal is subject to screening, inspection and/or search, and must possess a form of identification acceptable to Terminal.

## 2.9    SAFE BERTH

The Master of the Vessel shall be solely responsible for determining if the depth of water (at any tide or river stage) is sufficient for the Vessel, the Terminal having no responsibility therefore and the Terminal shall not be deemed to warrant the safety of public channels, fairways, approaches thereto, anchorages or other publicly maintained areas either inside or outside the port area where any Vessel may operate. Furthermore, the Terminal shall not be deemed to warrant the safety of any of the Terminal's berths, docks, anchorages, facilities or approaches thereto.

## 2.10    CARGO OR DEBRIS ON DECK OF VESSEL

Vessels shall not arrive at the Terminal with Cargo or any other obstruction on its deck. The Vessel agrees that if notified of such condition, it shall be the sole responsibility of the Vessel to clean and remove any such product which renders the deck of any such Vessel dangerous to the safety of any person. Should the corresponding Vessel fail to promptly clean and remove any product from the deck of any such Vessel, ABT reserves the right, but not the obligation, to clean and remove the product from the Vessel's deck, which service will be solely for the account of the Vessel. Alternatively, ABT may reject the Vessel and/or refuse to perform Terminal operations. Any time used to clean and remove such product rendering the deck dangerous to the safety of any person shall not count against laytime.

## 2.11    LINE HANDLING

The master and crew of every Vessel shall provide assistance in handling lines and operating deck machinery. An English-speaking deck officer must be available to ensure timely response to the directions of any representatives of the Terminal relative to the handling of lines. Terminal representatives will position lines on the shoreside or to buoys. It is the Vessel's responsibility to maintain safe and sufficient mooring throughout the duration of the Vessel's visit.

## 2.12    USE OF TUGS

When a Vessel is entering or leaving the berth, ABT shall arrange for up to two tugs. If in the opinion of the Terminal management, the weather, river or other conditions so warrant, each Vessel upon entering and leaving or lying at berth (including shifting within the berth) may be required to make use of additional tugs, depending on the size of the Vessel, which additional tugs shall be at the sole risk and expense of the Vessel per the charges contained in **Exhibit A**. A one (1) hour waiting period from the call-out time is allowed. Any additional time will be invoiced at the current standby rate. If called out and not used, the current reporting fee charged by the provider will apply. Additional charges for towage services may be assessed to the Vessel by ABT.

All tug services are provided subject to, and the Vessel accepts and agrees to be bound by, Moran Towing Corporation's Terms and Conditions in effect on the date services are rendered. Moran Towing Corporation's Terms and Conditions are available online at www.morantug.com/impala.

Terminal shall not be responsible for any claim, loss, liability, or damage whatsoever arising from or related to utilizing these tug services.

## 2.13    STOWAGE

ABT shall have no obligation to compact the Cargo upon Vessel loading. The Vessel shall be solely responsible for the stowage of the Cargo and must be self-trimming bulk carriers. Cargo shall be stowed within the Vessel only in areas where equipment spouts and terminal grabs (if available) can reach, subject to Vessel design capability. Should additional trimming be requested or required all additional fees shall be for Vessel's account.

In any event, the loading sequence plan shall not exceed two (2) pass loadings and two (2) hold trims. ABT will allow each Vessel one (1) draft check which is not to exceed a total of 30 minutes. Any Vessel exceeding the allotted number of draft checks or time for draft check will subject the Vessel to a fee of $7,500 per hour (with partial hours prorated) as liquidated damages.

The call of last cargo by an authorized Vessel Officer will be considered as final. Any cargo ABT agrees to load after the formal survey has commenced will subject the Vessel to an additional fee of $7,500 per hour (with partial hours prorated) as liquidated damages. Any time lost in re-establishing the loading will be counted against the Vessel rather than against the loading time for laytime calculations.

## 2.14    BUNKERS

Bunkers, diesel fuel, or oils may be received by Vessels in berth with prior written approval of Terminal.

## 2.15    VACATING BERTH

The Vessel shall vacate the berth within one (1) hour of completion of loading and draft survey or unloading. In addition, Terminal management may, in its sole discretion, and without liability, order the subject Vessel to vacate the berth if the Vessel fails to comply with the requirements herein or for any other reason. If a Vessel refuses or fails to vacate the berth within one hour of the completion of the final draft survey or otherwise ordered, ABT shall be entitled to charge and recover as liquidated damages from the Vessel, the sum of $7,500 per hour (with partial hours prorated) beginning one hour after (i) completion of the final draft survey, or (2) receipt of the notice to vacate and continuing until vacation of the berth occurs regardless of any intervening circumstances of any nature. If the Vessel does not vacate the berth in a timely manner, as defined by Terminal, the Vessel will be subject to, in addition to the liquidated damages above, all costs (including but not limited to attorney fees) and expenses in connection with the moving of the Vessel, which costs and expenses (and liquidated damages) shall be for the account of and the full risk of the Vessel.

At the Terminal's sole discretion, if weather and/or river conditions threaten the safety of any Vessel and/or the structural integrity of the Terminal, Terminal operations and/or services will be suspended and any Vessel at the berth or the buoys shall vacate the berth or buoys immediately when requested by the Terminal to do so and until such time as weather and/or river conditions permit return to the Terminal. If any Vessel does not leave the berth or buoys within 3 hours of being ordered to do so, all costs (including but not limited to attorneys' fees) and expenses in connection with the moving of the Vessel and mooring of same, shall be for the account of and at the full risk of the Vessel.  In no event shall ABT have any responsibility for any Vessel, including, but not limited to, the cost of moving a Vessel that is ordered to vacate the Terminal for any reason provided

11

in these Rules, and the Vessel shall indemnify and hold ABT harmless from same. Any damage to the Terminal or other equipment shall be the responsibility of the Vessel , and the Vessel shall indemnify, defend, and hold the Terminal harmless from any such damage. Any Vessel calling at the Terminal shall be subject to the written guidelines and procedures relative to hurricanes adopted by the Terminal, as such guidelines and procedures may be posted and updated from time to time by the Terminal.

### 2.16    LIQUIDATED DAMAGES

User agrees and acknowledges that it would be very difficult to accurately estimate the losses that ABT would incur due to an empty berth or other delays caused by User's use of the Terminal. User accepts responsibility for the liquidated damages if incurred in accordance with Sections 2.4, 2.5, 2.13, 2.15 and 3.6 of these Rules, and agrees that such liquidated damages are not a penalty and represent a fair and reasonable estimate of the damages or losses ABT may suffer as a result of the circumstances and durations to which liquidated damages are assessed herein.

### 3.    RIVER BARGE REQUIREMENTS AND ASSOCIATED CARGO HANDLING OPERATIONS

### 3.1    MOORING OF BARGES

ABT operates a closed fleet. All Barge Carriers shall obtain the prior approval of ABT before their line-haul towing vessels and River Barges enter the Terminal's fleet/berth/docks/buoys. Barge Carriers shall provide an ETA, tonnage, and any issues related to the River Barges to the Terminal via email at abt-dispatch@hostterminals.com . Any Barge Carrier delivering River Barges to the Terminal shall be responsible for mooring the River Barges in accordance with these Rules and any other regulations promulgated by the  Port of Greater Baton Rouge, and United States Coast Guard. If such approval by ABT is granted, Barge Carrier is required to comply with ABT's prescribed safety rules and personal protective equipment requirements and follow ABT's Facility Security Plan.

All River Barges brought into the Terminal fleet must be jointly inspected by t h e  Barge  Carrier and fleet operator prior to being placed in the Terminal fleet (such joint inspection may sometimes be hereinafter referred to as the "**Joint Inspection**"). The Joint Inspection shall include:

    A.  Check for water in all voids, including wing tanks, bow, and stern compartments;
    B.  Inspect above water areas for signs of recent and/or major damage;
    C.  Inspect grain doors on covered River Barges to ensure that they are in the closed position;
    D.  Inspect deck fittings to ensure all are present;
    E.  Observe draft and trim of loaded River Barge(s) to determine that River Barge(s) are safe for fleeting; and
    F.  Inspect all deck areas and walkways for Cargo or other debris that may impede the safety of personnel.

A River Barge moored to another River Barge, a mooring or spar barge, a Vessel, a wharf, or a pier, will be secured as near as practicable to each abutting corner of the River Barge being moored by:

    A.  Four-part wire rope of at least 7/8" diameter with an eye at each end of the rope passed around the timberhead, kevel or button;
    B.  A mooring line of natural or synthetic fiber that has at least 75 percent of the breaking

strength of four-part 7/8" diameter wire rope; or

    C.   Fixed rigging that is equivalent to four-part 7/8" diameter wire rope.

Any River Barges arriving at the Terminal without lines, wire or stationary rigging meeting the requirements set forth above will not be accepted by the Terminal until such time as proper equipment is furnished. Upon arrival or departure from the Terminal, all line-haul towing vessels are required to contact the Terminal harbor boats. The Terminal harbor boat operator in attendance shall have the right, although not the obligation, to determine if the River Barges have been properly secured by the towing vessel.

## 3.2    CONDITIONAL ACCEPTANCE OF RIVER BARGE

In the event a Barge Carrier tenders a River Barge for placement into the Terminal fleet which, based on ABT's sole discretion, is: (1) found to be in a leaking or otherwise damaged condition during the Joint Inspection whereby ABT believes such River Barge is not suitable or fit for fleeting, Cargo handling operations, and/or is otherwise unseaworthy; or (2) lacking adequate freeboard or otherwise improperly loaded with Cargo such that fleeting operations and/or Cargo handling operations may be unsafe, then ABT may refuse to accept such River Barge at the Terminal and in the fleet, or, alternatively, ABT may elect to "**Conditionally Accept**" such River Barge. In the event, ABT agrees to "Conditionally Accept" a River Barge, ABT will provide notification to the Shipper and Barge Carrier by e-mail confirming that ABT will accept the subject River Barge, but the acceptance of the River Barge shall be a "Conditional Acceptance." In the event ABT Conditionally Accepts a River Barge, Shipper and Barge Carrier agree to be responsible for and assume all liability for the condition of the River Barge and to defend, indemnify, and hold harmless ABT for any and all claims and expenses (including the payment of reasonable attorneys' fees, court costs, expert witness fees, and all litigation expenses regardless of type) for (1) any sinking, loss of and/or damage to the River Barge or the Cargo contained therein regardless of fault, and even when the River Barge is in ABT's care, custody and/or control, and (2) any damage or loss sustained to other property and for personal injury, illness and death claims, caused by or related to, in whole or in part, the Conditionally Accepted River Barge.

Barge Carrier and Shipper hereby agree that notice of the River Barge's leaking, damaged, lack of freeboard and/or improperly loaded condition resulting in such River Barge being Conditionally Accepted by ABT shall be considered "privity and knowledge" by the Barge Carrier and Shipper of the River Barge's condition so as to waive any right the Barge Carrier and/or Shipper may have to limit liability pursuant to the Shipowner's Limitation of Liability Act, 46 U.S.C. 30501, et. seq. In addition, Barge Carrier and Shipper hereby agree the River Barge is being handled at the Terminal pursuant to a "Personal Contract", and it is the intention of the Barge Carrier, Shipper, and ABT that the Barge Carrier and Shipper shall not be entitled to limit their liability to ABT in any respect under the afore-referenced Shipowner's Limitation of Liability Act.

## 3.3    CARGO ON DECK OF RIVER BARGE

Barge Carriers acknowledge that any River Barge arriving at the Terminal with Cargo on its deck may constitute a hazardous and unsafe condition. Barge Carriers agree that if notified of such condition, the Barge Carrier shall be responsible to clean and remove any such product which renders the deck of any such River Barge hazardous to the safety of any person.  Should the Barge Carrier fail to promptly clean and remove the product from the deck of any such River Barge, the Terminal reserves the right, but not the obligation, to clean and remove the product from the River Barge's deck, which service will be solely for the account of the Shipper. Alternatively, the

Terminal may reject the River Barge and refuse to accept it at the Terminal or into the Terminal's Fleet. The Barge Carrier and Shipper shall coordinate and be solely responsible for all required inspections for cleanliness and compliance with all local, state, and federal laws and regulations relative to the fitness of the River Barge. All run off reporting and other environmental compliance and reporting shall be the Barge Carrier's and Shipper's sole responsibility. Any EPA, regulatory or court-imposed fines levied against Terminal as a result of the Barge Carrier's and Shipper's non-compliance and/or failure to report shall be for Barge Carrier's and/or Shipper's account.

## 3.4    RIVER BARGE FLEETING AND SHIFTING CHARGE

River Barges fleeted and/or shifted at the Terminal shall be charged for the service by ABT at the rate provided for in ABT's Fleet Service Rate Schedule, included as **Exhibit B**.

## 3.5    RIVER BARGE COVER HANDLING

Unless other arrangements are made in writing with ABT in advance, any River Barges with stacked hatch covers or requiring Terminal assistance in handling any River Barge covers shall be charged for the service at the rate provided in ABT'S Fleet Service Rate Schedule.

## 3.6    RIVER BARGE RELEASE

A.   ABT reserves the right to restrict access to its barge fleet due to impending tropical weather systems, other adverse weather conditions or the existence of high or low water river conditions. This may include, but is not limited to, suspending services and/or ordering fleeted River Barges to vacate the fleet within three (3) hours of the delivery of such order from ABT and until such time as weather and/or river conditions permit return to the Terminal. Barge Carriers shall indemnify, defend, and hold ABT harmless from and against any and all disputes, claims, liabilities, causes of action, damages, or expenses (including but not limited to court costs and reasonable attorneys' fees), whether incurred by ABT or alleged by others, in connection with any loss of life, bodily injury, impairment of health and/or damage to or loss of any property, directly or indirectly arising out of, related to, and/or resulting from the Barge Carrier's failure to remove River Barges from the fleet following ABT's order to vacate. This indemnity applies, even if the harm is caused by ABT's sole or concurrent negligence or by any preexisting deficiency or defect, hidden or otherwise, in the facilities, except to the extent that the loss, injury, or damage results from ABT's gross negligence or willful misconduct.

B.   ABT intends to operate in accordance with the "MEMORANDUM OF UNDERSTANDING BETWEEN THE U.S. COAST GUARD, VESSEL OPERATORS, FLEETS, TERMINALS AND INDUSTRY ORGANIZATIONS REGARDING FLEET OPERATIONS DURING HURRICANE SEASON" as drafted in 2014 or its successor. However, all additional costs to prepare or tend to River Barges shall be for the account of the Barge Carrier.

C.   Once loading or unloading of a River Barge has been completed, as determined by ABT personnel, the River Barge must be picked up within six (6) days or fleeting rates are increased per ABT's Fleet Service Rate Schedule (Exhibit B). Notwithstanding anything to the contrary herein, ABT has the right to demand that the River Barge be picked up within seventy-two (72) hours of ABT's transmittal of written notice to the Barge Carrier that the River Barge must be removed.

D.   In the event that a River Barge is not removed as stated in this Section 3.6, Terminal

14

management may, at its sole election, (1) charge the Barge Carrier $2,000 per day or portion thereof as liquidated damages while the River Barge remains in the fleet, or (2) arrange to have the River Barge shifted to a commercial barge fleet at the sole risk and expense of the Barge Carrier.

E.  ABT will not be responsible for any additional cleaning charge (hoppers or decks) post River Barge release unless notified by Barge Carrier prior to the River Barge's departure from ABT's fleet.

F.  ABT will endeavor to send an email for release of barges daily, but on days when the Barge Carrier does not receive such a notice, it is the Barge Carrier's sole responsibility to check with ABT on the status of barge loadings and unloadings. A Barge Carrier's failure to receive email notice of barge release will not result in the barge(s) remaining on placement.

## 3.7    RIVER BARGE CARGO MINIMUM

All River Barges arriving at ABT for unloading must have at least 1,500 tons of Cargo on board. Any River Barges unloaded by ABT with less than 1,500 tons will be invoiced the difference between the actual River Barge tonnage and the River Barge Cargo Minimum at the contractual rate.

## 3.8    RIVER BARGE LIMITATIONS/REQUIREMENTS

A.  Maximum Length: 205'

B.  Maximum Width: 35'

C.  No stacked hatch covers are allowed when the Donaldsonville Gauge reads 17' or higher. Terminal will not unload stacked hatch cover barges or accept constructive placement of stacked cover barges during this river condition.

D.  Barges with a combined hull and coaming height of 18' will not be accepted when the Donaldsonville gauge is 30' or greater higher.

## 3.9    RIVERBARGE NOMINATION REQUIREMENTS

Shipper shall provide the following information on each Barge not later than 7 days prior to the projected ETA of the Barge at the Terminal: the individual barge number, tonnage, loading drafts, name of carrier, projected ETA, a designation of whether the Cargo is to be delivered to the storage pad or held for direct transfer to Vessel, and the type of Cargo carried or to be carried, which report shall be subsequently updated on the Monday of each week until such Barges are received at the relevant fleet.

## 3.10    ADDITIONAL CHARGES

ABT may assess such other charges to Barge Carriers as detailed in ABT's Fleet Service Rates Schedule.  Such services shall be assessed based upon ABT's discretion, and include, if required, the pumping of barges with standing water down to two (2) inches. Barge Carrier shall remit payment in accordance with ABT instructions for all services ABT provides as set forth in ABT's Fleet Service Rates Schedule.

## EXHIBIT A

## USER FEE SCHEDULE

1.    **USER FEE**

ABT charges a fee ("**User Fee**"), to all Vessels based on gross registered tonnage (GRT) as reflected on International Tonnage Certificate or if certificate is not provided as listed in IHS Global Limited's Vessel Database.

The User Fee shall be $3.93 per Vessel GRT for the duration of the loading or discharging.

Each Vessel shall be assessed the User Fee based on the Vessel GRT.  In any event, for the purpose of calculating the User Fee, the minimum Vessel GRT shall not be less than 30,000 GRT.

The User Fee is inclusive of the below listed services:
Security Fee
Environmental Fee
Dockage Fee
Up to two (2) Tugs for dock and undock
Line handling
Stores/Bunker Delivery
Crew Shore Leave
Facility Overtime
Spout Trimming

2.    **ADDITIONAL TUGS**
Additional tugs are provided at a rate of $4,400 per tug.

3.    **TUG STANDBY, HOLD-IN TUG, WARPING ASSISTANCE, AND DELAY CHARGES**
A charge of $1,400 per hour per tug will be assessed for any delays, warping assistance, hold-in tug, or tug standby time. Fuel surcharge to apply.

4.    **FUEL SURCHARGE**
A fuel surcharge will be applied to the User Fee as per the Fuel Surcharge Table on page 17. Any services provided that are not included in the User Fee will incur a fuel surcharge fee relevant to those services; this will be broken out as a line item on the corresponding invoice.

5.    **LAYCAN CANCELLATION FEE**
$35,000 per Occurrence

6.    **OTHER ADDITIONAL CHARGES**
Services not expressly covered in the above shall be assessed on an as-incurred basis, with ABT to provide notification of the rates applicable thereto.  User's continued use of the Terminal upon such notice shall constitute acceptance of such rates and charges.

16

# ASCENSION BULK TERMINAL
## Fuel Surcharge Table

Ascension Bulk Terminals will assess a Fuel Surcharge to the User Fee when the price per gallon ABT pays for its No. 2 diesel fuel is $2.50 per gallon (the "Base Fuel Price") or above.  A fuel surcharge of 1% will be assessed to the User Fee for every $0.03 per gallon increment at or above the Base Fuel Price.

 The User Fee is adjusted on the 1st and 15th of each month based upon the price paid on those dates.

| DIESEL PRICE | FUEL SURCHARGE | DIESEL PRICE | FUEL SURCHARGE |
|---|---|---|---|
| $2.500 – $2.529 | 1% | $3.460 – $3.489 | 33% |
| $2.530 – $2.559 | 2% | $3.490 – $3.519 | 34% |
| $2.560 – $2.589 | 3% | $3.520 – $3.549 | 35% |
| $2.590 – $2.619 | 4% | $3.550 – $3.579 | 36% |
| $2.620 – $2.649 | 5% | $3.580 – $3.609 | 37% |
| $2.650 – $2.679 | 6% | $3.610 – $3.639 | 38% |
| $2.680 – $2.709 | 7% | $3.640 – $3.669 | 39% |
| $2.710 – $2.739 | 8% | $3.670 – $3.699 | 40% |
| $2.740 – $2.769 | 9% | $3.700 – $3.729 | 41% |
| $2.770 – $2.799 | 10% | $3.730 – $3.759 | 42% |
| $2.800 – $2.829 | 11% | $3.760 – $3.789 | 43% |
| $2.830 – $2.859 | 12% | $3.790 – $3.819 | 44% |
| $2.860 – $2.889 | 13% | $3.820 – $3.849 | 45% |
| $2.890 – $2.919 | 14% | $3.850 – $3.879 | 46% |
| $2.920 – $2.949 | 15% | $3.880 – $3.909 | 47% |
| $2.950 – $2.979 | 16% | $3.910 – $3.939 | 48% |
| $2.980 – $3.009 | 17% | $3.940 – $3.969 | 49% |
| $3.010 – $3.039 | 18% | $3.970 – $3.999 | 50% |
| $3.040 – $3.069 | 19% | $4.000 – $4.029 | 51% |
| $3.070 – $3.099 | 20% | $4.030 – $4.059 | 52% |
| $3.100 – $3.129 | 21% | $4.060 – $4.089 | 53% |
| $3.130 – $3.159 | 22% | $4.090 – $4.119 | 54% |
| $3.160 – $3.189 | 23% | $4.120 – $4.149 | 55% |
| $3.190 – $3.219 | 24% | $4.150 – $4.179 | 56% |
| $3.220 – $3.249 | 25% | $4.180 – $4.209 | 57% |
| $3.250 – $3.279 | 26% | $4.210 – $4.239 | 58% |
| $3.280 – $3.309 | 27% | $4.240 – $4.269 | 59% |
| $3.310 – $3.339 | 28% | | |
| $3.340 – $3.369 | 29% | | |
| $3.370 – $3.399 | 30% | | |
| $3.400 – $3.429 | 31% | | |
| $3.430 – $3.459 | 32% | | |

**EXHIBIT B:**
**RIVER BARGE SERVICE RATES**

**1. FLEETING**

| | | |
|---|---|---|
| Dry Cargo, Open Hopper and Deck Up to 200' x 35' | $65.00 | per day |
| Special Cargo – Equipment Barges – Towboats* | $115.00 | per day |

*A watchman is required with all towboats*

**2. TUG SERVICE**

| | | |
|---|---|---|
| Tug Service (hourly rate with a one hour minimum) | $320.00 | per hour |
| Tow Building | $530.00 | per barge |
| Tow Building Assist (30-minute max per barge) | $265.00 | per barge |
| Rigging Removal* – double-ups and additional rigging | $110.00 | per barge |

*Picking up of loose rigging at the hourly tug rate*

**3. BARGE HANDLING**

| | | |
|---|---|---|
| Includes "in" charge, shift to dock, shift from dock and "out" charge | $1,650.00 | per barge |
| Commercial barge handling – "in" charge (not unloading at ABT) | $600.00 | per barge |
| Commercial barge handling – "out" charge (not unloading at ABT) | $600.00 | per barge |

**4. UNLOADING BARGES WITH STACKED COVERS**

Unless otherwise specified in a separate agreement, River Barges with stacked covers will be charged $3,725 per barge. River Barges with stacked covers are only acceptable for unloading when the Donaldsonville Gauge is below 17'. For the avoidance of doubt, ABT will not accept barges with closed covers unless pre-approved.

**5. COAL BARGE SURCHARGE**

All barges containing coal for unloading at ABT will be assessed a surcharge of $1,000.00 per barge.

**6. BARGE PUMPING SERVICES**

Barge Pumping $530.00 for the first 3 hours. Thereafter, each hour will be charged at $110.00 per hour, or portion thereof charged in 15-minute increments.

**7. ADDITIONAL FLEETING CHARGES**

**FAILURE TO REMOVE RIVER BARGES.** Unless the parties have otherwise entered into an averaging agreement, the following fee structure shall be assessed on a per barge basis beginning once loading or unloading is completed:

| | |
|---|---|
| Day 1-6 | $65.00 per day (published rate) |
| Day 7+ | $110.00 per day |

**HIGH WATER PREMIUM.** When the Donaldsonville Gauge ("DONL1") reaches 27' or higher at any point during a River Barge's visit, a 25% high water premium will be added to all River Barge Service Rates.

**FUEL ESCALATION CLAUSE.** Rates and charges for tug services quoted herein are based upon the price of No. 2 diesel fuel not exceeding $2.00 per gallon. In the event the price of No. 2 diesel fuel exceeds $2.00 per gallon, a fuel surcharge, added to each invoice, will be assessed on the following basis: 1% fuel surcharge for every $0.03 per gallon increase over $2.00 per gallon. The fuel surcharge will be based on the lowest of ABT's quoted fuel costs on the 1st and 15th of each month and will be adjusted on those dates.

18

## EXHIBIT C

## BERTH APPLICATION

**Vessel Name:** _____

**IMO #:** _____

**Estimated time of arrival at Southwest Pass:** _____

**Agent:** _____

**Surveyor of Record:** _____

**Vessel:**

    **LOA:**

    **Beam:**

    **GRT:** _____

    **DWT:** _____

**Disport:** _____

**Departure Draft:** _____

**Estimated Arrival Max Waterline to the top of hatch coaming*:** _____

*WLHC 61' (less river condition at Donaldsonville Gauge)*

19