# Exhibit H



L. Etienne Balart
D:  504.582.8584
F:  504.589.8584
ebalart@joneswalker.com

# Memorandum

Attorney-Client Privileged and Attorney Work Product

<u>Via E-mail (matthew.mancheski@tparkerhost.com)</u>

**TO:** TP Host, LLC

**FROM:** L. Etienne Balart

**DATE:** November 10, 2025

**RE:** Avanza Trading, LLC – Contract Review
JW File 29040600

---

Matt,

As requested, we have reviewed the Terminaling and Throughput Agreement by and between Impala Terminals Burnside, LLC and Avanza Trading, LLC, dated November 27, 2023 and Amendment #1 to that certain agreement dated October 30, 2024 (collectively "the Agreement").  Pursuant to the Amendment, the Agreement term expires in December 2026, with an option to renew for a three year term ending in December of 2029.  Generally, the Agreement intends to "lock in" certain rates for Services and Ancillary Services, both defined terms.  The scope of our review deals with what rates are subject to these limits.

As an initial matter, the Agreement is governed by New York law.  Under New York law, agreements are to be construed in accord with the parties' intent.  *See Slatt v Slatt*, 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099, *rearg denied* 65 N.Y.2d 785, 482 N.E.2d 568, 492 N.Y.S.2d 1026 (1985). "The best evidence of what parties to a written agreement intend is what they say in their writing."  *Slamow v Del Col*, 79 N.Y.2d 1016, 1018, 584 N.Y.S.2d 424, 594 N.E.2d 918 (1992). Therefore, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.  *See, e.g. R/S Assocs. v New York Job Dev. Auth.*, 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358, 771 N.E.2d 240, *rearg denied* 98 NY2d 693 (2002); *W.W.W. Assocs. v Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990).

A corollary to this rule is that extrinsic evidence cannot be uses to vary the terms of a written agreement.  Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.  *See, e.g.*, *W.W.W. Assocs.*, 77 N.Y.2d

at 162; *Mercury Bay Boating Club v San Diego Yacht Club*, 76 NY2d 256, 269-270 (1990); *Judnick Realty Corp. v 32 W. 32nd St. Corp.*, 61 NY2d 819, 822 (1984); *Long Is. R. R. Co. v Northville Indus. Corp.*, 41 NY2d 455 (1977); *Oxford Commercial Corp. v Landau*, 12 NY2d 362, 365 (1963). That rule imparts "stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses * * * infirmity of memory * * * [and] the fear that the jury will improperly evaluate the extrinsic evidence." Fisch, New York Evidence § 42, at 22 [2d ed]. If the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity. *See, e.g.*, *Teichman v Community Hosp. of W. Suffolk*, 87 N.Y.2d 514, 520, 640 N.Y.S.2d 472, 663 N.E.2d 628 (1996); *First Natl. Stores v Yellowstone Shopping Ctr.*, 21 N.Y.2d 630, 638, 290 N.Y.S.2d 721, 237 N.E.2d 868, *rearg denied* 22 NY2d 827 (1968). Only in the event that a court deems the contract terms ambiguous may extrinsic evidence of the parties' intent be considered. *See W.W.W. Assocs.*, 77 NY2d at 162.

With that background in mind, we understand that an issue has arisen regarding the scope of the below paragraph in Section 11 of the Agreement:

> (a)   Rates. Subject to the terms and conditions of this Agreement, **Product Owner** shall pay Impala for the Services at the rates set forth at Exhibit A, Fees, and the Burnside Tariff, as applicable. The Parties hereby agree that the rates to be paid to Impala by Product Owner pursuant to this Agreement shall be inclusive of all stevedoring charges, wharfage, dockage, equipment use or rental fees, tolls, taxes, tariffs, and any other fees or costs levied against Impala in the performance of Services hereunder. All other fees and costs, including but not limited to, shifting and fleeting fees, wharfage and dockage fees, mooring fees, port charges, tolls, harbor fees, taxes, tariffs, survey fees, security fees, and any other fees or costs levied against the Ocean Vessel, River Barges or the Cargo, shall be for account of Product Owner, the Ocean Vessel, charterers or agents as customary. Any extra services requested by Product Owner that are not considered to be a normal and regular function of a standard stevedoring transfer service or are outside the scope of the Services to be performed under this Agreement shall be priced by Impala on a case-by-case basis.

(emphasis added). In our view, the Agreement very clearly makes the Rates only applicable to the Product Owner (Avanza) and does not limit or otherwise restrict the terminal owner from assessing other rates to parties other than the Product Owner. First, Product Owner is a defined term and is defined as Avanza only. That term therefore does not include Avanza's agents, customers or any other party. Services is a term specifically defined to be the services provided by the terminal owner to Avanza on Exhibit A. This only serves to reinforce that the Rates for Services are only applicable as between terminal owner and Avanza and for those services provided directly to Avanza. Section 11 goes on to clarify that the rates to be paid "to Impala by Product Owner pursuant to this Agreement shall be inclusive of all stevedoring charges, wharfage, dockage, equipment use or rental fees, tolls, taxes, tariffs, and any other fees or costs *levied against Impala* in the performance of Services hereunder." Again, this reinforces that the Rates are only inclusive of a limited amount of Services *rendered by the terminal to Product Owner*, not all fees and costs attributable to a larger operation or to all fees and costs attributable to the operation. Customary, as that term is used in section 11(a), is an explicit recognition by the parties of services customarily provided to and paid for by other entities (*i.e.*, fleeting, dockage) and thus outside of the defined Services (or Ancillary Services) subject to the Agreement.

Finally, to eliminate any ambiguity as to the application of Rates and what fees and services are or are not included, Section 11 states clearly that a broadly defined "catch-all" is *not* covered by the agreed

Rates and therefore is chargeable against a third party or Avanza. Specifically, Section 11 recognizes that "[a]ll other fees and costs …, **and** any other fees or costs levied against the Ocean Vessel, River Barges or the Cargo, shall be for account of Product Owner, the Ocean Vessel, charterers or agents as customary. This language clearly indicates that the parties both contemplated *and agreed* to additional rates being charged for other services *as customary*.

As to the additional question of other services not covered by the Agreement, barge fleeting services are not within the contemplation of Services. While the Agreement incorporates the terminal owner's current tariff as Exhibit C, the only operative language concerning the application of the rates and services set out in Exhibit C is found in (i) Section 1, detailing the scope of the agreement as Services and Ancillary Services provided by the terminal owner *to Avanza*; (ii) the listing of Services in Exhibit A; (iii) and Section 11, which locks in the Rates as between terminal owner and Avanza. As important, Exhibit C contains no rates covering fleeting related services, or other customary charges at fleeting and provided by a separate entity from terminal owner that is not subject to the Agreement.

While Section 6(a) of the Agreement deals with "Vessel Unloading and Loading," it makes no incorporation of Exhibit C. To the contrary, in Section 6(a), the parties agree that fees for fleeting and shifting are subject to *separate* agreement. There is an express reservation in the terminal owner's favor of the right to require barge carriers (*i.e.*, inbound Product) to use the terminal owner's fleet and towage services. These rates and charges are not set forth in Exhibit A, not listed as an item included in the Services, not listed in Exhibit C and therefore are not covered as an "all in" rate nor prohibited from being assessed to others, as applicable, given the language in Section 11.

Further, Section 11(a) applies the agreed Rates (including the Burnside Tariff) but only as to those Services rendered by and between Avanza and terminal owner. Stated differently, while the Exhibit C rates are applicable to services rendered *to* Avanza, the language in Section 11(a) – which is the only clause in the Agreement that locks in the Rates for specified services – only applies as to transactions between the terminal owner and Avanza. Finally, that section contains a specific reservation for the terminal owner to assess charges for the account of third parties "as customary." Only those Services or Ancillary Services as between terminal owner and Avanza are subject to the Agreement's Rates as defined in either Exhibit A or Exhibit C.

**-LEB-**