George K. Kontakis (GK-0484)
george.kontakis@klgates.com
J. Tanner Honea (5566252)
tanner.honea@klgates.com
K&L GATES, LLP
599 Lexington Avenue
New York, NY 10022
T: 212.536.4021
*Attorneys for Plaintiff*
*Avanza Trading, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x
                        :

AVANZA TRADING LLC,              :

                        :

        Plaintiff,       :     1:26-Civ.-0064 (LGS)

                        :

      -v-              :

                        :   **MEMORANDUM OF LAW IN**
                        :   **SUPPORT OF MOTION FOR**
                        :   **SUMMARY JUDGMENT**

ASCENSION BULK TERMINAL, LLC  :

                        :

        Defendant.     :

----------------------------------------------------x

**<u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

## Table of Contents

TABLE OF AUTHORITIES .................................................................................................. 3

INTRODUCTION ............................................................................................................... 4

FACTUAL BACKGROUND ............................................................................................... 6

PROCEDURAL BACKGROUND...................................................................................... 12

STANDARD OF REVIEW ............................................................................................... 13

ARGUMENT.................................................................................................................... 13

I.    The Agreement's rates, including the Tariff, apply to services the Terminal provides to any vessel carrying Avanza's Product. ..................................................................... 13

A.    The Agreement's plain language ensures that the Tariff and agreed rates apply to barges and vessels transporting Avanza's Product................................................... 14

B.    Ascension's interpretation of the Agreement creates internal inconsistencies that undermine the Agreement's plain language and fundamental purpose................................. 16

C.    If the Court identifies any ambiguity, extrinsic evidence demonstrates that the Parties intended for the Agreement's rates to apply to all vessels carrying Avanza's Product. ....... 21

CONCLUSION.............................................................................................................. 255

<u>TABLE OF AUTHORITIES</u>

**CASES**

*Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 657 (S.D.N.Y. 2015) ........................................ 13

*Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002)........................................................ 20

*Compagnie Financiere v. Lynch*, 232 F.3d 153, 158 (2d Cir. 2000) .............................................. 21

*Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992)............................................................................ 19

*John Hancock Mut. Life Inc. Co. v. Carolina Power & Light Co.*, 717 F.2d 664 (2d Cir. 1983) . 23

*Kepner-Tregoe v. Vroom*, 186 F.3d 283, 287 (2d Cir. 1999) ......................................................... 23

*Lockheed Martin Corp. v. Retail Holdings N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ......................... 14

*Mastrovincenzo v. City of New York*, 435 F.3d 78 (2d Cir. 2006) .................................................. 20

*Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 444 (D. Conn. 2010)...................................... 13

*Nycal Corp. v. Inoco PLC,* 988 F. Supp. 296, 299, n. 9-11 (S.D.N.Y. 1997), *aff'd*,
    166 F.3d 1201 (2d Cir. 1998) ................................................................................................ 21, 23

*Olin Corp. v. OneBeacon America Ins. Co.*, 864 F.3d 130, 148 (2d Cir. 2017)............................ 21

*Preminger v. Columbia Pictures Corp.*, 267 N.Y.S.2d 594, 599 (N.Y. Sup. Ct. 1966), *aff'd*, 269
    N.Y.S.2d 913 (N.Y. App. Ct. [1st Dept.] 1966)........................................................................ 23

*RM 14 FK Corp. v. Bank One Trust Co.*, N.A., 37 A.D.3d 272, 274 (N.Y. App. Ct.
    [1st Dept.] 2007])..................................................................................................................... 21

*Trans Pacific Leasing Corp. v. Aero Micronesia*, 26 F. Supp. 2d 698, 709 (S.D.N.Y. 1998)....... 23

**STATUTES**

28 U.S.C. § 2201............................................................................................................................ 13

46 U.S.C. § 31342.......................................................................................................................... 19

Fed. R. Civ. P. 56(a) ...................................................................................................................... 13

N.Y. Civil Practice Law and Rules (CPLR) § 3001....................................................................... 13

Fed. R. Civ. P. 57........................................................................................................................... 13

Plaintiff Avanza Trading, LLC, ("Avanza") submits this memorandum of law in support of its Motion for Summary Judgment against Defendant Ascension Bulk Terminal, LLC ("Ascension").

## <u>INTRODUCTION</u>

At bottom, this matter is a simple, blatant and transparent attempt by a new owner of a shipping terminal, to renegotiate, frustrate or otherwise avoid an existing contract it simply does not like. Avanza filed suit seeking the Court's intervention to protect its business and its contractual rights and economic interests when the new owner of a shipping terminal threatened to, and then unilaterally did, change the terms and pricing of a multi-year and multimillion-ton commitment. Avanza is a coal trader. It is in the business of purchasing coal from various U.S. suppliers and then selling the coal for a profit to international buyers. The process requires Avanza to purchase coal, arrange for its transportation to the Ascension terminal on the Mississippi River (the "Terminal"), offload and stockpile the coal at the Terminal, and load the coal onto ocean-going vessels that then transport the coal to various buyers (Avanza's customers).

For their mutual benefit, Avanza and Ascension (previously named "Impala" or "Impala Burnside Terminal"), entered into a Terminaling and Throughput Agreement ("Agreement") that guaranteed certain rates for the Terminal's services in exchange for Avanza's commitment to ship a substantial minimum volume over a multi-year period through the Terminal. Because coal is relatively fungible, Avanza does not control the market price for selling its coal, and Avanza's profit therefore depends entirely on incurring the lowest possible costs for purchase, transportation, and storage of the coal (the "Product"). Therefore, the vessels moving Avanza's product in and out of the Terminal are not a peripheral or optional component of the Agreement; they are essential

to Avanza's performance and satisfaction of its contractual throughput commitments, as well as Avanza's profitability.

The Agreement provided agreed rates for discharging, stockpiling, and loading the coal (the "Product"), and it also set rates for the Terminal's handling of barges and ocean-going vessels transporting Avanza's Product. Only about one week after a new parent company purchased the Terminal and renamed it from Impala to Ascension, Ascension took the position that it can unilaterally increase the price for vessel-related services, despite contractual language to the contrary. The Agreement expressly incorporated the terms and pricing of the Terminal's tariff that was in effect at the time of the Agreement's execution and provided that the tariff, including its rates, would continue to apply throughout the contractual term, including any extension periods. Ascension, to the contrary and without reason, argues that it can ignore this express incorporation and invoke a new tariff, thereby charging Avanza for services based on an entirely different pricing schedule. Ascension made this new tariff effective on January 1, 2026, and has, in fact, enforced same.

Ascension's interpretation of the Agreement is irreconcilable with the Agreement's text, structure, commercial purpose, and the evidentiary record. That position ignores the commercial reality as it allows Ascension to unilaterally override the terms of an Agreement designed to provide stable pricing into one that permits shifting, indeterminate, and self-serving rate increases at Ascension's discretion.

Ascension's position collapses under basic principles of contract interpretation, and its reading would render the overall purpose of the Agreement and key provisions of the Agreement meaningless while eliminating the fixed-rate structure that defines the Agreement and would produce a commercially irrational outcome. Even if the Court were to find that any provision of

the Agreement is ambiguous, which is denied, extrinsic evidence of the Parties' negotiations and witnesses' testimony confirms the Parties' intent that the Agreement's rates would apply to any vessel discharging, carrying, or loading Avanza's Product. Ascension should be blocked from attempting to upend the fundamental purpose of the Parties' Agreement.

## FACTUAL BACKGROUND

Avanza primarily trades coal by purchasing it from U.S. suppliers and ultimately selling it to international customers or buyers.[1] Avanza organizes and bears the cost of moving and storing the coal from the suppliers until it reaches the buyers. However, Avanza does not own coal mines, terminals, barges, trucks, trains, or ocean-going vessels.[2] Avanza turns a profit by predicting the coal market and contracting for the supply, transportation, and storage of coal at rates that collectively beat predictions of the market price.[3]

Avanza loads coal directly into barges or delivers coal from U.S. mines or other suppliers onto barges.[4] The barges then move the coal to the Ascension Terminal on the Mississippi River where it is either loaded directly from the barge into ocean-going vessels, or more frequently, offloaded and stored at the Terminal for later shipment via ocean-going vessels that call at the Terminal.[5] Most of the disputed charges in this matter concern charges related to costs for the Terminal's services to the barges and ocean-going vessels discharging and loading Avanza's Product alongside the Terminal.[6]

Avanza began doing business with the Impala Burnside Terminal in 2022 with spot shipments.[7] Shortly thereafter, Impala and Avanza entered the 2022 Terminaling and Throughput

---

[1] Kontakis Decl. at Ex. 1, p. 112, l. 13 – p. 113, l. 12; Kontakis Decl. at Ex. 2, p. 19, l. 10 – 13.
[2] Kontakis Decl. at Ex. 2, p. 20, l. 14 – 19; Kontakis Decl. at Ex. 1, p. 112, l. 13 – p. 113, l. 12.
[3] Kontakis Decl. at Ex. 1, p. 114, l. 4 – p. 116, l. 12; Kontakis Decl. at Ex. 2, p. 19, l. 6 – 21.
[4] Kontakis Decl. at Ex. 1, p. 114, l. 4 – 20.
[5] *Id*.
[6] Kontakis Decl. at Ex. 10, AVANZA 0084 – 90.
[7] Kontakis Decl. at Ex. 1, p. 137, l. 13 – 19.

6

Agreement ("2022 Agreement"), the predecessor to the Agreement that is the subject of this litigation.[8] Under the 2022 Agreement, Avanza committed to ship a minimum of 540,000 metric tons of coal through the Terminal in exchange for certain rates for Terminal services.[9]

Like the 2022 Agreement, the Agreement that is the subject of this litigation was negotiated in 2023 between Andrew "Andy" Smolenack for Avanza with Amber Palmer and Allen Walker for Impala.[10] Palmer initially amended the pricing and volume commitments from the 2022 Agreement with redlines and emailed that offer to Smolenack as the initial draft of the 2023 Agreement.[11] Smolenack then sent a draft back with Avanza's edits and counter, revising the Agreement's definition of "Tariff" in redline to expressly mean the Burnside Terminal Rules and Regulations effective February 1, 2021 (the "Tariff") as follows:[12]

> Tariff means, collectively, the "Burnside Terminal Rules and Regulations" and any other published tariff of Impala, including all other requirements, rules, regulations, and documents governing the operation of the Terminal that are posted on its website with the address XXXXXXX (NEEDS UPDATING). The current Impala Terminals Burnside Rules and Regulations Rate Schedule, dated and effective February 1, 2021, shall remain valid and in force throughout the term of the Agreement, attached Exhibit C. http://www.impalaterminals.com/network-of-terminals/impala-terminals-north-america/impala-terminal-burnside/(or any replacement address provided by Impala), as any of the foregoing may be amended and supplemented from time to time in Impala's sole discretion and without the need for notice of any such amendment to Product Owner or any other party.

Notably, Smolenack struck prior language that allowed Impala to update the Tariff from "time to time in Impala's sole discretion," and mandated that the specific Tariff effective in 2021 would remain in force throughout the term of the Agreement, including any extension period.[13] Impala responded to this proposal only to insert the updated reference to a website address and to

---

[8] *Id.*; *Id.,* at p. 58, l. 12 – 20; Kontakis Decl. at Ex. 5, AVANZA 04240 – 41 (Palmer mentions adjusting terms from the "current agreement," referring to the 2022 Agreement).

[9] Kontakis Decl. at Ex. 5, AVANZA 04240 – 41; (*see* Palmer's reference to adjusting "commercial terms").

[10] Kontakis Decl. at Ex. 1, p. 58, l. 21 – p. 59, l. 24; Kontakis Decl. at Ex. 2, p. 41, l. 15 – 20.

[11] Kontakis Decl. at Ex. 5, AVANZA 04240 – 41.

[12] *See Id.*, AVANZA 04245.

[13] *Id.*

remove the extraneous language indicating the website address required updating (i.e. "XXXXXXX (NEEDS UPDATING)"):[14]

> **Tariff** means, collectively, the "Burnside Terminal Rules and Regulations" and any other published tariff of Impala, including all other requirements, rules, regulations, and documents governing the operation of the Terminal that are posted on its website with the address ~~XXXXXXX (NEEDS UPDATING).~~ The current Impala Terminals Burnside Rules and Regulations Rate Schedule, dated and effective February 1, 2021, shall remain valid and in force throughout the term of the Agreement, attached Exhibit C. https://www.impalaterminals.com/media/vrihbaii/2021_impala_burnside_terminal_rules.pdf ~~http://www.impalaterminals.com/network-of-terminals/impala-terminals-north-america/impala-terminal-burnside/(or any replacement address provided by Impala), as any of the foregoing may be amended and supplemented from time to time in Impala's sole discretion and without the need for notice of any such amendment to Product Owner or any other party.~~

Impala agreed to Avanza's changes, and the final, signed version of the Agreement provided as follows: [15]

> **Tariff** means, collectively, the "Burnside Terminal Rules and Regulations" and any other published tariff of Impala, including all other requirements, rules, regulations, and documents governing the operation of the Terminal that are posted on its website with the address The current Impala Terminals Burnside Rules and Regulations Rate Schedule, dated and effective February 1, 2021, shall remain valid and in force throughout the term of the Agreement, attached Exhibit C. https://www.impalaterminals.com/media/vrihbaii/2021_impala_burnside_terminal_rules.pdf

In addition to changing the definition of "Tariff," Avanza asked to attach the Tariff's Rate Schedule as Exhibit C of the Agreement "so there are no questions about what is applicable."[16] The Rate Schedule, which was "Schedule C" of the Tariff, was added as "Exhibit C" to the Agreement, included charges for dockage, towage, line handling, launch services, security, barge handling costs, and use of a mid-stream crane.[17]

---

[14] Kontakis Decl. at Ex. 6, AVANZA 14250.
[15] Kontakis Decl. at Ex. 3, AVANZA 14281, 14297.
[16] Kontakis Decl. at Ex. 5, AVANZA 04240.
[17] Kontakis Decl. at Ex. 3, AVANZA 14306.

Aside from pricing and volume commitments, the definition of "Tariff" was the most significant change between the 2022 and 2023 Agreement. During his deposition, Impala's former terminal manager who oversaw negotiation of the Agreement, Allen Walker, agreed that Avanza specifically negotiated this provision to "lock in" rates that would be charged by the Terminal, which Avanza's Andy Smolenack further confirmed during his deposition:

> Q. [Mr. Kontakis] And do you see the red line where it says, Needs updating. And then it reads, The current Impala Terminal Burnside rules and regulations, Rate Schedule dated and effective February 1, 2021, shall remain valid and in force throughout the term of the agreement. Attached Exhibit C. Do you see that?
> A. [Mr. Walker] Yes.
> Q. And so you said earlier that this was Avanza wanting to lock in the rates from the 2021 tariff; is that right?
> A. Correct.
> Q. And then do you see the language that was struck there?
> A. Yes.
> Q. And it says that -- and I'm going to read a portion of it where it says -- ...as any of the foregoing may be amended and supplemented from time to time in Impala's sole discretion and without the need for notice for any such amendment to product owner or any other party. Do you see that?
> A. Yes.
> Q. And so did Avanza strike out Impala's ability to change the tariff during the term of the contract?
> A. Yes.
> Q. And did you accept those changes?
> A. Yes.
> Q. And so as long as this contract was in effect, the terminal could not change the tariff, right?
> A. Correct.[18]
>
> . . .
>
> Q. [Mr. Kontakis] As part of that agreement, did you seek to lock in your costs?
> A. [Mr. Smolenack] Yes.
> Q. Was part of that agreeing to the tariff and the tariff rates?
> A. Yes, along with taking the liability that that volume commitment at that rate came in case we didn't ship the tons and had to write a check for no business and essentially only had negative profits.[19]

---

[18] Kontakis Decl. at Ex. 2, p. 40, l. 16 – p. 41, l. 24.
[19] Kontakis Decl. at Ex. 1, p. 117, l. 3 – 7.

With the understanding that Avanza had locked in the rates for all costs related to movement of its Product through the Terminal, Avanza guaranteed a throughput minimum of 1.2 million tons of coal over three years.[20] Vessels were the only way to move Avanza's Product in or out of the Terminal, and Impala provided all the requisite services necessary for barges and vessels to call at the Terminal.[21]

On October 30, 2024, Avanza and Impala entered "The First Amendment to the Terminaling and Throughput Agreement" (the "Amendment"), which increased Avanza's minimum shipping commitment through the Terminal to 2 million tons over the Agreement's original three-year term.[22] The Amendment also provided that Avanza had the option to extend the Agreement through December 31, 2029, by notifying Impala of Avanza's intention to extend no later than September 20, 2026. In exchange for the extension, Avanza's minimum shipping commitment could increase to 5.12 million tons.[23]

On October 8, 2025, Host Terminals ("Host") emailed Avanza stating that Host had acquired the Terminal and renamed it from "Impala Burnside Terminal" to "Ascension Bulk Terminal."[24] The same email expressed Host's intention to implement new rates effective on January 1, 2026, under a new tariff called the "Ascension Bulk Terminal Rules and Regulations" (the "2026 Tariff").[25] The 2026 Tariff increased rates and charges for vessel docking and wharfage, including a wholly new surcharge for coal barges that was not present in the Tariff or Tariff Rate Schedule incorporated into the Agreement.[26]

---

[20] Kontakis Decl. at Ex. 3, AVANZA 14281, AVANZA 14288, AVANZA 14298 – 14300, 14306.
[21] Kontakis Decl. at Ex. 2, p. 22, l. 4 – 23; Kontakis Decl. at Ex. 1, p. 118, l. 5 – p. 119, l. 24.
[22] Kontakis Decl. at Ex. 7, AVANZA 0029.
[23] *Id.* at AVANZA 0032.
[24] Kontakis Decl. at Ex. 8, AVANZA 12791; Kontakis Decl. at Ex. 12, Request No. 2.
[25] *Id.*
[26] *Id.*; Kontakis Decl. at Ex. 9, AVANZA 0081.

In November of 2025, Host forwarded a letter to Avanza from Host/Ascension's counsel claiming that Clause 11(a) of the Agreement only fixed rates for Terminal Services charged directly to Avanza,[27] and the Terminal was free to charge different rates to vessels carrying Avanza's Product if the vessels (as opposed to Avanza) were invoiced for the services. According to Ascension, Clause 11(a) provided an end-run around the Agreement whereby Ascension could charge vessels discharging or loading Avanza's Product any price for services provided by the Terminal.[28]

On November 24, 2025, the undersigned counsel for Avanza replied to Ascension's counsel explaining that under the plain language of the Agreement, the agreed prices must apply to any vessel or barge moving Avanza's Product. Avanza does not own vessels or barges, therefore any interpretation permitting the Terminal to charge vessels owned by third parties who are transporting Avanza's Product at rates higher than those in the Agreement would render the Agreement meaningless.[29] Host's counsel responded on December 1, 2025, largely reiterating the position in its original letter, and claiming that unless Avanza was paying the invoice, the Terminal was free to charge vessels transporting Avanza's Product increased rates under the new 2026 Tariff.[30]

While this suit was pending, Avanza loaded its Product onto an ocean-going vessel at the Terminal in March 2026, after the effective date (January 1, 2026) of the Terminal's "new" tariff. Although Avanza disagreed with Ascension's interpretation of the Agreement, Avanza attempted to comply with Ascension's misguided interpretation by directing the vessel's agent to invoice Avanza directly for the services to the vessel so that Avanza would pay the invoice in the first

---

[27] Kontakis Decl. at Ex. 10, AVANZA 00083 – 85.
[28] *Id.*
[29] Kontakis Decl. at Ex. 10, AVANZA 00086 – 88.
[30] Kontakis Decl. at Ex. 10, AVANZA 00089 – 91.

instance.[31]  However, hypocritically, Ascension balked at this application of its own interpretation of the Agreement, refusing to invoice Avanza directly, and insisting on charging the increased new tariff rates to the vessel through its agent.  Ascension's conduct demonstrated a clear intent to disregard its contractual obligations to Avanza's detriment.  Against this backdrop, Avanza has a contractual deadline of September 20, 2026, to extend the Agreement's term for an additional three years, which is coupled with a significant commitment to move substantially more Product through the Terminal.

## **PROCEDURAL BACKGROUND**

As a result of the Parties' dispute regarding the correct interpretation of the Agreement, Avanza filed a Complaint in this action on January 6, 2026, seeking a declaratory judgment regarding the Parties' contractual rights.[32]  Ascension subsequently filed its Answer (Doc. 31) to the Complaint on March 12, 2026.[33]

The Parties have exchanged written discovery and completed the depositions of Andrew Smolenack (Avanza) and Allen Walker (Impala's former terminal manager).  Ascension also issued a subpoena to Riverside Shipping, LLC, which was the third-party vessel agent coordinating services for barges and vessels calling at the Terminal, to which Riverside responded by providing responsive documents.

Avanza now files this summary judgment motion because Ascension's interpretation contravenes the Agreement's plain language, and discovery has demonstrated how Ascension's interpretation directly conflicts with the Parties' intent and the Agreement's fundamental purpose.

---

[31] *See generally*, Kontakis Decl. at Ex. 11.
[32] Dkt. No. 1.
[33] Dkt. No. 31; On March 9, 2026, this Court granted Ascension's motion to file certain documents under seal (Dkt. No. 30), which required the redaction of certain pricing information.  Cited exhibits have been redacted accordingly.

## STANDARD OF REVIEW

Avanza moves for summary judgment on its claim for declaratory judgment regarding its contractual rights pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Declaratory judgment is also permitted under New York law pursuant to N.Y. Civil Practice Law and Rules (CPLR) § 3001.

"Courts may properly address declaratory actions through a motion for summary judgment, which are subject to the same Rule 56(a) standard as any other motion for summary judgment." *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 657 (S.D.N.Y. 2015); *see also Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 444 (D. Conn. 2010). Accordingly, Rule 56 of the Federal Rules of Civil Procedure provides that a movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

### I. The Agreement's rates, including the Tariff, apply to services the Terminal provides to any vessel carrying Avanza's Product.

The Parties entered the Agreement seeking commercial predictability: the Terminal secured a predictable revenue stream, while Avanza obtained stable pricing insulated from market fluctuations. The plain language of the Agreement reflects the Parties' intention that Tariff rates would apply to the vessels used to meet Avanza's throughput obligation under the Agreement. Alternatively, to the extent that the Court identifies any ambiguity in the Agreement and looks to extrinsic evidence, emails exchanged to negotiate the terms of the Agreement and testimony from

both signing Parties confirm that they intended for the Agreement to apply to any vessel transporting Avanza's Product.[34]

Rather than interpreting the entire Agreement as it was objectively intended, Ascension improperly attempts to elevate form over substance and twist select phrases in the Agreement so it can charge higher rates. Ascension does not dispute that it is bound by the Agreement, only that it may charge vessels any price it wants.[35] As explained further *infra*, the premise that Ascension tries to build is not supported by the text of the Agreement or the Parties' intent.

### A. The Agreement's plain language ensures that the Tariff and agreed rates apply to barges and vessels transporting Avanza's Product.

Applying cardinal rules of contractual interpretation, the plain language of the Agreement demonstrates the Parties' intent that the agreed rates, including the Tariff, would apply to vessels moving Avanza's Product. When considering the contract as a whole "makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the [agreement]." *Lockheed Martin Corp. v. Retail Holdings N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)(internal citations omitted); *see also, Barnes v. Am. Int'l Life Assur. Co.*, 681 F. Supp. 2d 513, 520 (S.D.N.Y. 2010)(noting that "[w]hen it comes to general rules of contract interpretation, there is little difference between federal common law and New York law . . . ."). Here, the Agreement's purpose was to fix all costs associated with moving Avanza's Product through the Terminal in exchange for a guaranteed volume (i.e. revenue for the Terminal), and the Agreement's individual provisions must be read in a way that supports this fundamental purpose.

---

[34] Kontakis Decl. at Ex. 2, p. 40, l. 16 – p. 41, l. 24; Kontakis Decl. at Ex. 1, p. 117, l. 3 – 7.
[35] Kontakis Decl. at Ex. 10, AVANZA 00083 – 85.

The terms of the Agreement contain several indicia of the Parties' intent that any barge or vessel transporting Avanza's Product would be governed by the agreed rates. First, the Parties expressly negotiated the definition of Tariff, removing the Terminal's right to unilaterally change the Tariff and agreeing that the Tariff effective on February 1, 2021, would "remain valid and in force throughout the term of the Agreement."[36] The Tariff includes specific rates for dockage, line handling, docking/undocking, barge cover handling, and barge pumping, and the summary of Tariff rates for these services was attached as Exhibit C to the Agreement.

"In interpreting a contract under New York law, 'words and phrases... should be given their plain meaning,' and the contract 'should be construed so as to give full meaning and effect to all of its provisions.'" *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (citation and internal quotation marks omitted). The plain language of the Agreement demonstrates that the 2021 Tariff would apply to vessels and barges arriving at the Terminal to transport Avanza's Product because this throughput was the sole purpose of the Agreement.

The Agreement also defined "Vessels" as "any river barge" and "any ocean-going vessel" suitable for discharging or loading Avanza's Product and that were in the "employ or hired by" Avanza.[37] For these Vessels, Avanza had several obligations. Avanza was required to pay despatch for Vessels that the Terminal discharged or loaded faster than allowed, and Impala was required to pay Avanza demurrage for discharge and loading rates that were slower than allowed.[38] Avanza was required to book laycan periods for Vessels arriving at the Terminal to transport Avanza's Product, including providing copies of the Vessel's dimensions to the Terminal to ensure they could

---

[36] Kontakis Decl. at Ex. 6, AVANZA 14245; Kontakis Decl. at Ex. 3, AVANZA 14281.
[37] Kontakis Decl. at Ex. 3, AVANZA 14281 (Section 2(a) defines "Vessel" as "*any River barge…or ocean-going vessel…each of which are in the employ or hired by Product Owner.*").
[38] Kontakis Decl. at Ex. 3, AVANZA 14286, Section 6(e).

safely berth.[39] In fact, Section 5(c) of the Agreement provided that the Terminal's final acceptance of a nominated Vessel would be communicated to Avanza as a "Vessel Party" as defined in the Tariff, which included any person "nominating" or "contracting" with a Vessel.[40] Under the Agreement, it was also Avanza, as the Product Owner, who the Agreement provided "shall comply with the Tariff for all Vessel operations."[41] The Agreement also provided that "[a]ll weights will be settled using Vessel Draft Survey weights, provided to Impala <u>by Product Owner at Product Owners expense</u>." (emphasis added).[42]

In sum, for any Vessel discharging or loading Product at the Terminal, the Terminal looked to Avanza to satisfy performance under the Agreement without regard to technical ownership of the Vessels. Any interpretation of the Agreement that would allow the Terminal to unilaterally change rates charged to Vessels carrying Avanza's Product would be inconsistent with the plain language of the Agreement and Avanza's obligations concerning the Vessels. *Ja Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009)("In interpreting an unambiguous contract, the court is to consider its '[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby.'")(internal citations omitted).

### B. Ascension's interpretation of the Agreement creates internal inconsistencies that undermine the Agreement's plain language and fundamental purpose.

In its legal memoranda, letters, and submissions to the Court, Ascension has argued that it can escape the agreed pricing structure of the Agreement by misconstruing two provisions in Section 11(a), which provides as follows:

11. **RATES AND PAYMENTS**

---

[39] Kontakis Decl. at Ex. 3, AVANZA 14285, Section 5(c).
[40] Notably, the term "Vessel Party" does not appear in the Terminal's new 2026 Tariff; it only appears as a defined term in the 2021 Tariff. *Compare* Exhibit 9 at AVANZA 00055 *with* Exhibit 4.
[41] Kontakis Decl. at Ex. 3, AVANZA 14285, Section 6.
[42] Kontakis Decl. at Ex. 3, AVANZA 14286, Section 7.

(a) Rates. Subject to the terms and conditions of this Agreement, Product Owner shall pay Impala for the Services at the rates set forth at Exhibit A, Fees, and the Burnside Tariff, as applicable. The Parties hereby agree that the rates to be paid to Impala by Product Owner pursuant to this Agreement shall be inclusive of all stevedoring charges, wharfage, dockage, equipment use or rental fees, tolls, taxes, tariffs, and any other fees or costs levied against Impala in the performance of Services hereunder. All other fees and costs, including but not limited to, shifting and fleeting fees, wharfage and dockage fees, mooring fees, port charges, tolls, harbor fees, taxes, tariffs, survey fees, security fees, and any other fees or costs levied against the Ocean Vessel, River Barges or the Cargo, shall be for account of Product Owner, the Ocean Vessel, charterers or agents as customary. Any extra services requested by Product Owner that are not considered to be a normal and regular function of a standard stevedoring transfer service or are outside the scope of the Services to be performed under this Agreement shall be priced by Impala on a case-by-case basis.

Because Avanza does not own vessels, Avanza's typical purchase and sale of its Product, and the freight Avanza pays to vessels, incorporated the costs for Terminal services:

Q. [Mr. Kontakis] And I think we spoke about DA earlier, disbursements accounts?
A. [Mr. Smolenack] Yes.
Q. Putting into that freight rate port costs, would that include things like the tariff?
A. Yes.
Q. Would it be mostly the tariff?
A. Mostly the tariff in New Orleans.
Q. Those are the costs that are incurred by a vessel when she's in the terminal in the port?
A. Yes.
Q. And that would be factored into the freight rate?
A. Yes.[43]

The vessel or barge owners and charterers would then typically pay the Terminal directly for services rendered because the port costs were already included in the purchase/sale pricing and freight rates charged to Avanza.

Relying on Section 11(a), Ascension has argued that it could charge any rate to vessels or barges calling at the Terminal, even if the sole purpose of their presence at the Terminal was to

---

[43] Kontakis Decl. at Ex. 1, p. 142, l. 5 – 21.

discharge or load Avanza's Product, unless those services were being "paid to Impala by [Avanza]."[44]

First, this argument was exposed as a ruse when in March 2026 a vessel (M/V SHANDONG XIN TAI) called at the Terminal to load Avanza's Product. In an attempt to satisfy Ascension's alleged interpretation of Section 11(a), Avanza directed the vessel's agent to invoice Avanza directly for the Terminal's services.[45] Under Ascension's argument, this should have satisfied its complaint that only services charged directly to Avanza would be covered by the Agreement, however, Ascension refused to invoice Avanza. Ascension instead invoiced the vessel through its agent and applied the higher rates from the 2026 Tariff.[46] This hypocrisy demonstrated Ascension's true intent to simply ignore the Agreement's rates for services without regard to any bona fide legal argument.

Ascension has also incorrectly argued that the third full sentence of Section 11(a) acts as a kind of carveout permitting Ascension to charge any rate to vessels or barges without regard to the Agreement:

> All other fees and costs, including but not limited to, shifting and fleeting fees, wharfage and dockage fees, mooring fees, port charges, tolls, harbor fees, taxes, tariffs, survey fees, security fees, and any other fees or costs levied against the Ocean Vessel, River Barges or the Cargo, shall be for account of Product Owner, the Ocean Vessel, charterers or agents as customary.

Ascension's argument, however, misconstrues this sentence in the context of the entire section. The first sentence of Section 11(a) clearly states that Avanza will pay the Terminal based on rates in "Exhibit A, Fees, and the Tariff," making Avanza ultimately liable for payment to the Terminal for services rendered under the Agreement. The second sentence then provides that to

---

[44] Kontakis Decl. at Ex. 3, AVANZA 14288, Section 11(a).
[45] Kontakis Decl. at Ex. 11.
[46] *Id.*

18

the extent Ascension incurs costs from third parties for services it provides, those costs will not be passed on because they are already included in the Agreement's rates for services. The third sentence simply provides that the Terminal will levy fees and costs against ocean vessels, river barges, or cargo "as customary," meaning that the Terminal will bill those entities directly but applying the agreed rates. That sentence does not include any wording indicating that the agreed rates would not apply, only that the Terminal will levy the agreed rates against different entities "as customary," (i.e. in the normal course). Although unstated, there are several reasons the Terminal may prefer to bill this way, for example, services rendered to a vessel can give rise to a maritime lien, and it is reasonable to assume that this customary billing process may have been preserved so the Terminal would avoid any risk to losing its right to a lien for payment. *See, e.g.*, 46 U.S.C. § 31342 (establishing a maritime lien for persons providing necessaries, such as supplies, to a vessel).

Finally, the last sentence of Section 11(a) provides a true carveout by providing that "any extra services" that Avanza requests and that are "not considered to be a normal and regular function of a standard stevedoring transfer service" or are otherwise outside the scope of the Services to be performed under the Agreement "shall be priced by Impala on a case-by-case basis." This last sentence clarifies that the foregoing sentences all contemplated charging rates under the Agreement, and only if new or additional services were contemplated would the Terminal then separately price those services. *See Shaw Group, Inc.*, 322 F.3d at 124 (quoting *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992) (internal quotation marks omitted)( "'[A]n interpretation of a contract that has `the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'").

Ascension's argument that the third sentence of Section 11(a) permits it to charge increased rates to barges and vessels discharging and loading Avanza's Product would render substantial aspects of the Agreement meaningless.  It would first appear at odds with the second sentence of the same section, in that both sentences refer to some of the same services, including wharfage, dockage, tolls, taxes, and tariffs.  Ascension's interpretation would create unnecessary confusion in Section 11(a)'s meaning and application, where some services are covered by the Agreement, but some of those same services are also carved out of the agreement when billed "as customary."

Also, more fundamentally, Ascension's interpretation would undermine the entire purpose of the Agreement, allowing the mechanics of "customary" billing practices to subvert the benefit of Avanza's bargain to control its costs in exchange for providing a minimum amount of business to the Terminal.  Ascension's belief that it can require Avanza to provide a certain volume of Product while charging any rate it wants to the vessels carrying that same Product to or from the Terminal defeats the fundamental purpose of the Agreement.

Ascension's interpretation directly conflicts with well-settled law that a court must interpret contractual language in accordance with its ordinary meaning and in a manner that avoids unreasonable or absurd outcomes. Courts have repeatedly recognized that "[i]n deciding whether an agreement is ambiguous, [p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought." *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002)(internal citations omitted); *Mastrovincenzo v. City of New York*, 435 F.3d 78 (2d Cir. 2006)("[w]ords and phrases in a contract should be given their plain meaning, and the contract should not be interpreted to produce absurd results").  Accordingly, where one party's interpretation produces results that are internally

inconsistent, economically nonsensical, or incompatible with the structure of the Agreement, that interpretation must be rejected as a matter of law. That is precisely the case here.

**C. If the Court identifies any ambiguity, extrinsic evidence demonstrates that the Parties intended for the Agreement's rates to apply to all vessels carrying Avanza's Product.**

Although Avanza asserts that its interpretation is correct under the plain language of the Agreement, if the Court were to identify any ambiguity, the Parties' negotiations, witness testimony, and the Parties' course of dealing demonstrate that at the time of the Agreement's execution, the Parties intended for the Agreement to apply to any vessel transporting Avanza's Product.

A court may resolve ambiguous language on summary judgment as a matter of law "if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary" or "if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Compagnie Financiere v. Lynch*, 232 F.3d 153, 158 (2d Cir. 2000)(internal citations omitted). Courts resolve ambiguous contract terms "by examining the objective manifestations of the parties' intentions." *Nycal Corp. v. Inoco PLC,* 988 F. Supp. 296, 299, n. 9-11 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1998). Further, in interpreting the contract, Courts should give meaning to every provision of the contract, with no provision left without force and effect. *RM 14 FK Corp. v. Bank One Trust Co., N.A.*, 37 A.D.3d 272, 274 (N.Y. App. Ct. [1st Dept.] 2007]).

To the extent that the Court identifies any ambiguity in the Agreement and looks to extrinsic evidence regarding the Parties' intent, the evidence overwhelmingly demonstrates the Parties' intent that all services the Terminal provided to any Vessel discharging or loading Avanza's Product would be governed by the Agreement, including the Tariff expressly incorporated therein. *Olin*

21

*Corp. v. OneBeacon America Ins. Co.*, 864 F.3d 130, 148 (2d Cir. 2017)("When an agreement is ambiguous, courts may consider extrinsic evidence 'to ascertain the parties' intent at the formation of the contract.'").

First, Andrew Smolenack for Avanza and Allen Walker for Impala discussed adjustments to the terms of the Parties' 2022 Agreement that created the subject Agreement of this dispute. Smolenack specifically struck previous language that would have allowed the Terminal to unilaterally change the Tariff, and he specifically incorporated the Tariff in effect at that time into the Agreement, "so there are no questions about what is applicable."[47]

Walker not only affirmatively approved this edit, but his colleague who was copied on negotiation emails, also accommodated Smolenack's alteration by inserting a link to the entire Tariff into the Agreement's definition of Tariff.[48] Both Smolenack and Walker testified that they understand this alteration to "lock in" the Tariff and its rates:[49]

> Q. [Mr. Kontakis] And then on December 8th -- and this is Avanza 14245 -- on December 8th, Andy comes back and says, Thanks, Amber, see attached my comments. Edits back. Let's include the current Rate Schedule as Exhibit C in the doc so there are no questions about what is applicable. Do you see that?
> A. [Mr. Walker] Yes.
> Q. Do you know what Andy was referring to when he said the current rate schedule to be added as Exhibit C in the doc?
> A. The tariff rates.
> Q. So Avanza was seeking to include the tariff rates in the contract?
> A. Yes. In the event there was an increase.
> Q. And when you say "in the event there was an increase," by incorporating them into the contract, they wanted to avoid an increase?
> A. That would be correct.
> Q. So in other words, they would fix the rates in the contract for the contract duration?
> A. Correct.[50]

---

[47] AVANZA 04240; Kontakis Decl. at Ex. 2, p. 40, l. 16 – p. 41, l. 24; Kontakis Decl. at Ex. 1, p. 117, p. 3 – 7.
[48] AVANZA 14245.
[49] Kontakis Decl. at Ex. 2, p. 40, l. 16 – p. 41, l. 24; Kontakis Decl. at Ex. 1, p. 117, p. 3 – 7.
[50] Kontakis Decl. at Ex. 2, p. 37, l. 16 – p. 38, l. 12; *see also*, AVANZA 14250.

Avanza's request during negotiations to eliminate language from the prior agreement that would have allowed for rate increases under new tariffs, and the substitution of language specifically preventing any rate increases that was accepted by Impala in the final and signed version of the Agreement demonstrates a clear understanding that rates were fixed and could not increase. Although Walker and Palmer did not sign the Agreement, they were Impala's only representatives who negotiated the terms of the Agreement with Avanza, and expressions of intent from the negotiating representatives of each party are objective manifestations of the parties' intent. *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 299 & n.9-11 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1998). Any attempt to manufacture a question of fact about whether Walker negotiated the Agreement for Impala Burnside, now Ascension, is irrelevant because manifest intent is found when one party expresses their intention without opposition from the other party. *Kepner-Tregoe v. Vroom*, 186 F.3d 283, 287 (2d Cir. 1999). Also, Impala in fact signed the Agreement that incorporated Avanza's requested changes.

To the extent any other terms of the Agreement may appear inconsistent with incorporation of the Tariff, the specifically negotiated provision should control. "[S]eparately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated." *Trans Pacific Leasing Corp. v. Aero Micronesia*, 26 F. Supp. 2d 698, 709 (S.D.N.Y. 1998). When this type of evidence aligns with the direct evidence it "unmistakably leads this Court to find [what] these parties intended…" *Id.*; *see also*, *Preminger v. Columbia Pictures Corp.*, 267 N.Y.S.2d 594, 599 (N.Y. Sup. Ct. 1966), *aff'd*, 269 N.Y.S.2d 913 (N.Y. App. Ct. [1st Dept.] 1966) cited by *John Hancock Mut. Life Inc. Co. v. Carolina Power & Light Co.*, 717 F.2d 664 (2d Cir. 1983)("'[W]here the parties have particularized the terms of a contract an apparently inconsistent general statement to a different effect must yield.'").

It is also notable that to the extent the specifically negotiated provision incorporating the Tariff may not be consistent with other provisions in the Agreement, Avanza negotiated the Agreement without the assistance of counsel.[51]  Contrarily, the Agreement included a notice provision that all contractual notices should go to Allen Walker's email address with copy to "houstonlawyers@Trafigura.com," and Walker testified that he believed it was "likely" Trafigura's attorneys reviewed the proposed redline edits before the Agreement was signed.[52]  Also, Section 12(c) of the Agreement specifically provided that "[i]f there is a conflict between this Agreement and the Tariff, the terms of this Agreement shall control."[53]  The Agreement expressly provided that the 2021 Tariff would continue in force through the term of the Agreement, and the Tariff's terms would control over the Agreement.

Regarding the parties' execution of the Agreement, as the Terminal's general manager testified during his deposition, the Terminal treated any Vessel discharging or loading Avanza's Product as an "Avanza Vessel," without regard to its ownership status:

> Q. [Mr. Kontakis] Okay. And when you were tracking these barges or vessels for Avanza, did you save them in your sort of system as an Avanza vessel or Avanza barge?
> A. [Mr. Walker] Yes.
> Q. And, for example, if Trafigura had a vessel or barge, it would say "Trafigura vessel" or "Trafigura barge"?
> A. Yes.
> Q. And then, through this tracking, were you also tracking volume?
> A. Yes.
> Q. And was that to make sure you knew whether a customer like Avanza was meeting its throughput commitment?
> A. Yes.
> Q. Did the terminal care who actually owned the barge or owned the vessel?
> A. No.[54]

---

[51] Kontakis Decl. at Ex. 1, p. 63, l. 19 – 22 ("Q. Did you have any lawyers that were consulting on the negotiation agreement? A. No.").
[52] Kontakis Decl. at Ex. 2, p. 42, l. 5 – p. 43, l. 4.
[53] Kontakis Decl. at Ex. 3.
[54] Kontakis Decl. at Ex. 2, p. 25, l. 22 – p. 26, l. 15.

The Terminal was only concerned that the Agreement's throughput volume was met by Avanza, not how Avanza chose to make its arrangements with the Vessels transporting its Product. As previously addressed *supra*, the Agreement required Avanza to satisfy a variety of obligations for <u>any</u> Vessel arriving at the Terminal to transport Avanza's Product, demonstrating both Parties' intent to treat any Vessel discharging or loading Avanza's Product as a Vessel covered by the Agreement. Ascension's position is that the Parties entered into the Agreement only to fix pricing for Vessels owned by Avanza, as opposed to Vessels transporting Avanza's Product This nonsensical interpretation is inconsistent with the Agreement's purpose of providing stable pricing in exchange for a required throughput by allowing the Terminal to unilaterally charge any price for vessel services and increase Avanza's costs (or reduce its profitability). These costs directly impact the price of Avanza fulfilling its throughput obligation, which in turn, impacts Avanza's profitability. Ascension's position would allow the Terminal to increase costs without any limit or control whatsoever.

For these reasons, there is no genuine dispute of material fact and Avanza is entitled to judgment as a matter of law. The Agreement's text, structure, and incorporated Tariff establish that the rates governing vessels carrying Avanza's Product were fixed as part of the Parties' bargain. Ascension's contrary position cannot be reconciled with the Agreement and depends entirely upon an interpretation that is commercially irrational and legally untenable. Even if the Court were to find ambiguity, the extrinsic evidence, including the contract negotiation, the Parties' conduct during the contractual term, and deposition testimony, uniformly confirm Avanza's interpretation.

<b><u>CONCLUSION</u></b>

Ascension has benefitted from the Agreement's guaranteed throughput volume, totaling millions of tons of Avanza's Product, in exchange for guaranteeing set rates for services to be

25

provided by the Terminal.  The Parties entered into a long-term, multi-year contract for their mutual benefit, and Ascension cannot unilaterally change the terms of that agreement in a transparent cash-grab.  Ascension is bound by the Agreement, and Avanza's business rightfully depends on continued application of the agreed rates it bargained for to vessels discharging, transporting, and loading its Product.  Avanza respectfully asks the Court to grant its Motion for Summary Judgment and prohibit Ascension from escaping its contractual obligations.

**WHEREFORE**, Plaintiff Avanza respectfully prays that the Court issue an Order:

(a) granting summary judgment in Plaintiff Avanza's favor holding that the Agreement, including the Tariff known as the Burnside Terminal Rules and Regulations effective February 1, 2021, shall apply to any barge or ocean-going vessel discharging, carrying, or loading Avanza's Product through the end of the contractual term, including any extended term;

(b) awarding Avanza its fees and costs, as Ascension's misguided approach and refusal to honor the contract terms unnecessarily forced Avanza to incur substantial costs and fees in this matter; and,

(c) granting Plaintiff any such other and further relief to which it may be entitled.

Dated: June 5, 2026

Respectfully submitted,

**K&L GATES, LLP**

/s/ George Kontakis

George K. Kontakis
J. Tanner Honea
K&L GATES LLP
599 Lexington Avenue
New York, New York 10022-6030
george.kontakis@klgates.com
(212) 536-4021

## LOCAL RULE 7.1(C) CERTIFICATION

In accordance with Local Rule 7.1(c) and the Individual Practices and Procedures, I certify that the foregoing Memorandum of Law contains **6,971** words, which does not include the caption, any index, table of contents, table of authorities, signature blocks, or any required certifications, but does include material contained in footnotes or endnotes. This is within the allowable limit of 8,750 words set by this Court.

/s/ George Kontakis

_____
George K. Kontakis